# International Agri. Cor. *v.* Abercrombie.

## *Assumpsit.*

(Decided November 18, 1913.　63 South. 549.)

1. *Evidence; Experts; Growing Crops.*—Where the defense to an action in assumpsit was set off for injuries to growing crops caused by the sulphurous fumes from the fertilizer factory operated by plaintiff, witnesses having qualified as experts on farming and agriculture as to the particular lands in question, may testify as to what crops the land would have produced during the season but for such fumes, the amount actually produced with the fumes present and the value of the respective crops, and the amount produced on similar lands under a like cultivation for the seasons past, since with the season past and the method of cultivation known there is no element of speculation as to what crops would have been produced except for the fumes, and the only basis of arriving at the damage is to determine the difference in value of the crops produced and those that would have been produced had there been no fumes.

2. *Damages; Injuries to Crops; Measure.*—Where the set off was for damages to growing crops caused by the emission of sulphurous fumes from plaintiff's fertilizer plant, the measure of damages is the difference in the yield and price of crops with and without the fumes complained of.

3. *Appeal and Error; Review; New Trial.*—The appellate courts are averse to reviewing the action of the trial court in granting or refusing motion for new trial.

4. *Verdicts; Quotient Verdict.*—Where the jurors being unable to agree as to the amount of damages decide to let each juror set down the amount which he thought was just, and then to divide the total by the number of jurors, a verdict based on such an estimate was a quotient verdict even though the jurors afterwards adopted it and none dissented.

5. *Same.*—The evil effects of a quotient verdict cannot be cured by the subsequent adoption of the verdict or the adoption of a slightly different verdict by the jury.

6. *New Trial; Grounds; Quotient Verdict.*—A new trial should be granted where a quotient verdict is rendered as such a verdict is not the true verdict of all of the jurors, and would render possible the forcing of an unfair verdict by a few of the jurors resorting to extremes.

APPEAL from Montgomery City Court.

Heard before Hon. GASTON GUNTER.

Action by the International Agricultural Corporation against C. G. Abercrombie, in assumpsit; from a judgment for defendant on his pleas of set-off and recoupment, plaintiff appeals. Reversed and remanded.

The facts are sufficiently stated in the opinion of the court. After judgment, motion was made for a new trial; the fifth ground being that the verdict was a quotient verdict, and improperly arrived at.

The following is the affidavit of William M. Williams, together with the exhibits thereto:

"State of Alabama, Montgomery County. Before me, H. F. Crenshaw, a notary public in and for said state and county, personally appeared William M. Williams, known to me, who, being duly sworn, says that he is now and has been since the commencement of the above-entitled suit one of the attorneys for plaintiff; that the said action was tried in the city court of Montgomery, on to wit, the 10th and 11th days of April, 1912; that the case was finished and submitted to the jury, and the jury retired to consider its verdict about 4:30 p. m., April 11, 1912; that proponent was present when the jury retired to consider its verdict, and saw them go into the west jury room of the courthouse; that the jury did not reach a verdict for several hours, not until 7:30 in the night of April 11th; that proponent heard of the verdict during that night, and, noticing the unequal number of dollars and cents, concluded that it must have been a quotient verdict, and for the purpose of looking for the papers, on which the verdict was figured, went to the courthouse between 6 and 7 o'clock on the next morning before the jury room in which the said jury considered their verdict had been swept; that proponent found on the floor of said jury room a sheet of paper which had been torn in pieces and crumpled together, which said sheet of paper deponent has put to-

gether, pasted to a blank sheet, and attached hereto, marked 'Exhibit A'; that said sheet of paper contained a draft of said verdict of the jury in pencil, in the same handwriting as the verdict returned on the back of the complaint, and also contains 11 sums showing a total of $27,600; that said paper also shows that the said total sum was divided by 11, making a quotient of $2,-509.10, from which there was subtracted, as shown on the paper, $1,637, the amount of plaintiff's claim, leaving a result of $872,10; that at the same time, in a few feet of the place where deponent picked up the said torn and crumpled sheet of paper, he also found 10 slips of cardboard, and one slip of paper, each piece thereof containing a separate sum, and a sum on each piece corresponding to a sum in the column of figures on the torn and crumpled sheet of paper as aforesaid; that deponent immediately took the above-mentioned torn and crumpled sheet of paper and slip of cardboard and paper into his possession, and has had them in his possession until the present time, when they are filed herewith as Exhibits A and B to this affidavit. Deponent further says that he is informed and believes, and on such information and belief states, that when the jury retired to consider their verdict they were divided in their opinion as to the amount of damages defendant had suffered, said opinions varying in amount from nothing to $5,000; that after further consideration it seemed that no agreement could be reached, and it was suggested that each man should write on a separate sheet of paper the amount he considered the defendant entitled for damages for his property, and that these amounts should be added up and divided by 11, and that from the quotient there should be subtracted the amount of plaintiff's claim, and that the result should be the verdict of the jury."

### EXHIBIT A.

"We, the jury, find for defendant under the plea of set-off and assessed damages at eight hundred and seventy two dollars and ten cents ($872.10):

| | |
|---|---|
| 1. | 3000.00 |
| 2. | 2000.00 |
| 3. | 2250.00 |
| 4. | 3000.00 |
| 5. | 2000.00 |
| 6. | 2250.00 |
| 7. | 3000.00 |
| 8. | 3000.00 |
| 9. | 2000.00 |
| 10. | 3000.00 |
| 11. | 2100.00 |

11/27,600.00
   22
  —
   56
   55
  —
   100            2509.10
    99            1637.00
   —
    1             872.10"

Exhibit B consists of 10 pieces of cardboard with amounts corresponding to amounts set opposite numbers in Exhibit A, except 10. The amount found on the slip of paper corresponds with No. 10, and on it is a division of $27,600.00 by the number 11.

The following is the affidavit of the juror Powell: "Before me, Henry F. Bartlett, a notary public, in and

for the county of Montgomery and State of Alabama, personally appeared George M. Powell, Jr., known to me, who, being duly sworn, deposes and says: That he was a member of the jury which tried the above-entitled suit in the city court of Montgomery on to wit, the 10th and 11th days of April, 1912. That he participated in the deliberation of the jury after the jury retired for the purpose of considering the case. That when the jury first went out there was considerable variance between the members of the jury as to the amount that should be awarded. That after considerable discussion and consideration among themselves, the jurors all agreed to award defendant damages in an amount somewhere between $2,000 and $3,000. That thereupon the following plan was adopted: That each of the jurors put on a piece of paper the amount he was willing to award in damages, and that these several amounts be added up and divided by the number of jurors, for the purpose of ascertaining the average, and this average was to be accepted as the verdict. That after the average was thus ascertained it was found that it ran out into uneven decimals, and some member of the jury moved that the verdict in favor of defendant be for $872.10. That notwithstanding the adoption of this plan as above stated, I did not feel bound to adopt the average so ascertained, and if the amount so found had not been what I considered a fair, just, and proper verdict, I would have objected, nor did I consider the other jurors bound by the average so ascertained, but they had a right to object to returning a verdict for the amount so obtained, and, in my opinion, they would have done so if they had not considered it a fair and just verdict. That thereupon, in order that the verdict to be rendered might be the true verdict of each juror, and that no juror should feel that he had been coerced into the verdict by the plan adopted to get the

average, as hereinabove stated, and in order to ascertain whether the verdict in favor of defendant on his plea of set-off for $872.10 was the amount each juror thought defendant should recover, W. A. May, the foreman, and affiant several times asked all the jurors if the verdict of $872.10 in favor of defendant was their verdict for that amount. That in response to this inquiry all of the jurors agreed that the verdict should be in favor of defendant for said amount, and thereupon the verdict was written out by affiant, signed by the foreman, and so returned."

RUSHTON, WILLIAMS & CRENSHAW, for appellant. The court erred in admitting the testimony of B. L. Moss as to what the land should have produced.—*Gresham v. Taylor*, 51 Ala. 505; *B. & A. Ry. v. Brown*, 158 Ala. 618; 140 Am. St. Rep. 304; 2 L. R. A. (N. S.) 168. This matter is entirely conjectural.—36 Pac. 254, and authorities supra. The same is true of the witness Abercrombie. Usually the measure of damages is the difference between the value of the land with the growing crops on it and the value with the crops off.—*Mitchell v. Billingsly*, 17 Ala. 271; 28 Am. St. Rep. 563; 102 Ia. 266; 94 S. W. 1102. The court erred in refusing to give at the request of plaintiff the general affirmative charge as to the watermelons, peas, onions, sugar cane, oats and fruit trees.—Authority supra. The verdict was a quotient verdict and was therefore not legal, and the court should have granted a motion for the new trial based on this ground.—*So. Ry. v. Williams*, 113 Ala. 620; 141 S. W. 146; 123 S. W. 704; 63 Kan. 65; 22 Kan. 277; 13 Mont. 387; 40 Am. St. Rep. 452.

WEIL, STAKELY & VARDAMAN, and PHARAS COLEMAN, for appellee. The court properly held the measure to be

the difference between the market value of what the prob-
able yield would have been and the market value of the
actual yield.—*Bigbee F. Co. v. Scott,* 3 Ala. App. 333;
*Gresham v. Taylor,* 51 Ala. 505. The court properly re-
ceived expert testimony as to this matter.—*Baker v.
Cotney,* 142 Ala. 566; 12 A. & E. Enc. of Law, 437; 5
Enc. of Evid. 555 and cases there cited. Counsel discuss
the assignments of error relative to evidence, and the
giving and refusing of charges in the light of these au-
thorities, with the insistence that no error intervened.
The jury's verdict was not illegal nor was it shown to
be a quotient verdict.—*B. R. L. & P. Co. v. Moore,* 148
Ala. 115; *So. Ry. v. Williams,* 113 Ala. 620; *City of Eu-
faula v. Speight,* 121 Ala. 613; 22 A. & E. Enc. of Law,
1280; 3 Cyc. 276; 88 Am. St. Rep. 232; 40 Am. St. Rep.
452.

MAYFIELD, J.—Appellant sued appellee on two
promissory notes, which, with interest, aggregated $1,-
637, as to which there was no dispute or contest. Ap-
pellee interposed two special pleas of set-off, claiming
damages to his growing crops, fruit trees, etc., on ac-
count of sulphurous fumes escaping from plaintiff's fer-
tilizer factory, which was operated near defendant's
farm. The damages thus claimed were unliquidated,
but no question is raised as to the pleadings; the real
dispute was as to the amount of damages suffered in
consequence of the alleged wrongs complained of, in al-
lowing the fumes to escape and to injure and destroy
the defendant's crops, trees, etc.

A great many objections were interposed by the plain-
tiff to questions propounded to defendant's witnesses,
which sought to elicit answers going to show the dam-
ages and the amount thereof, as to both the crops and
the trees, and these objections were followed up by mo-

tions to exclude the answers, and exceptions were re-
served as to the adverse rulings. The questions raised
on this appeal, as to these rulings on the evidence, may
be classified as follows:   The court allowed witnesses
who had qualified as expert witnesses on farming and
agriculture, as to the particular land in question, to tes-
tify as to what amount of crops the defendant would
have produced on the land but for the alleged fumes;
the amount actually produced on the land in question
with the fumes present, the value of the respective crops
produced during the season in question, and the amount
produced on land similar to that in question, during the
same season, under like mode of cultivation, and with
the same kind of fertilizers.   We do not think there was
any reversible error as to any of these rulings on the
evidence.   The witnesses were shown to be experts in
that line of business, and familiar with the land in ques-
tion, the mode of cultivation, and the amount and kind
of fertilizers used; the season had passed when they tes-
tified; they knew what the land actually produced, with
the fumes, and what similar lands, under like condi-
tions, had produced without the deleterious effect of the
fumes; and they knew what the prices of the various
products were in the market.   In fact, the mode follow-
ed by the trial court would be the only mode which
would be practicable to ascertain or to prove the
amount of the damages (if any there were) in conse-
quence of the fumes complained of.   There was not an
entire destruction of the crops at one time, as by over-
flow or by depredation of stock; but the injury was al-
most continuous, or was at least recurring whenever the
factory was in operation and the fumes were being
emitted, and the chief damages claimed were in the di-
minished yield on account of the fumes.   For this rea-
son the rule is different from that governing in cases

where there is a complete destruction of the crops by live stock or by floods. The cultivation and care had to continue through the entire season, as if there had been no fumes or consequent damages.

The measure of damages was, of course, the difference in the yield and the price of the crops with, and without, the presence of the fumes complained of; and the evidence complained of was admissible for the purpose of showing these necessary elements which entered into the amount of damages suffered, if any there were. The evidence as to the amount produced and as to the price was not offered as showing the measure of damages, but as furnishing a basis from which to ascertain their amount.

Questions similar to these were raised in the case of *Bell v. Reynolds*, 78 Ala. 511, 56 Am. Rep. 52, where the damage flowed from the decreased production of land consequent upon the failure of the plaintiff to furnish fertilizers as agreed. The plaintiff in that case, as in this case, sued for the price of the fertilizer furnished, and the defendant pleaded set-off for diminished production of crops, on account of the plaintiff's failure to furnish the full amount of the fertilizer agreed to be furnished; and the trial court declined to allow proof to be made, such as was made and is complained of in this case. This court reversed the trial court on account of such rulings. The court, through Somerville, J., said: "We would not be willing to say that the damages here complained of by the defendant, Bell, by way of lost profits, would have been recoverable if their ascertainment had been left to mere conjecture. The amount of cotton, or other crops which land produces, is dependent upon so many varying contingencies as to render it very indeterminate. It will vary with the seasons, the adaptation of soil and climate, and its comparative ex-

emption from the ravages of worm or other destructive insects. Speculative opinions of witnesses as to the probable influences of these operative causes would be a poor criterion for the measure of values.—*Wilkinson v. Kctler,* 59 Ala. 306. In this case, however, these difficulties are entirely removed. The character of the season is absolutely known. So is the precise effect of the fertilizer used during this particular season. No speculation is needed as to how much rain and how much sunshine were requisite to produce a given amount of crops to the acre, nor as to the probable effect of the fertilizer upon different kinds of soil, or even the proportion of it best suited to the land, and therefore what would necessarily have been produced on the remainder, which is shown to have been in precisely the same state of cultivation and similar in quality of soil. The rulings of the court were opposed to this view, and were erroneous."

In the cases of *Bigbee Fertilizer Co. v. Scott,* 3 Ala. App. 385, 58 South. 86, questions similar to these were raised, and the same trial court ruled as ruled in this case. His rulings were affirmed by the Court of Appeals, and we think properly so.

As shown by notes to cases in 140 Am. St. Rep. 309; 27 L. R. A. (N. S.) 168-173; 12 L. R. A. (N. S.) 267, the decisions are not without conflict as to the proper measure of damages and the mode of proving the same. In the note, 140 Am. St. Rep., it is said: "The questions of the measure of damages for injuries to growing crops and of the manner of estimating damages in such cases are not altogether devoid of difficulty. The courts are not agreed upon the subject, and the cases are in more or less confusion. This confusion arises partly from a difference in the rules applicable to the measure of damages for injuries to growing crops, and in the

various holdings of the courts as to what evidence is admissible in such cases, and partly from the way in which various propositions of law as well as of fact are stated. These differences, added to the inherent difficulty of estimating the value of a growing crop, create some misgiving in the formation of general rules respecting the subject. There is no doubt, however, that compensation for the real injury is the purpose.of all remedies. Such does justice to both parties. The inquiry should therefore be, in each case how much was the plaintiff injured by the loss or destruction of his crop? This proposition is undisputed, but the courts, in arriving at the value of a growing crop, resort to several methods of computation, and either or all combined may afford a fair basis."

In the case reported in *Sayres v. Missouri Pac. Ry. Co.*, 82 Kan. 127, 107 Pac. 642, 27 L. R. A. (N. S.) at page 175, it is said by the Kansas court: "Such a crop has an actual and also potential existence, and a fair valuation can be made by witnesses of experience who are acquired with the character of the land on which it is growing, and the product derived from such land when properly cultivated, the ordinary course of agriculture and the climatic conditions of the region, the market price of ripened grain or product in the vicinity when mature, and also how far the crop had progressed toward maturity when injured or destroyed. Consideration may be taken of these and perhaps other conditions in estimating the value of the crop, but these are not measures of value, but only evidence to enable a jury to determine the value of the crop at the time and place of the injury and destruction. The owner is entitled to recover the actual loss which he sustained; and it was an immature crop, subject to many contingencies and open to attack by numerous enemies, and not a ma-

ture crop, which he lost. While the authorities are generally agreed that the damages must be measured as of the time of the injury and loss, there is some variety of expression as to the methods of reaching that result. Some are to the effect that it is the actual value at the time of the loss, and others that it is the market value of the crop at that time. Some say it is the value of the crop when destroyed, considered in connection with the value of the right which the owner had to mature and gather it; others, that a proper criterion is the value when matured after deducting for future contingencies and the expenses for cultivation and care. Some arrive at the result by taking the difference in the value of the land before and after the injury or loss to the crop, while others have gone to the extent of holding that the rental value of the land for the season is the basis for computing the loss. These authorities are gathered in an elaborate note to *Teller v. Bay & River Dredging Co.,* 12 L. R. A. (N. S.) 267."

In the case reported in 151 Cal. 209, 90 Pac. 942, 12 L. R. A. (N. S.) 267, 12 Ann. Cas. 779, it is said, in conclusion, by the California court, quoting from other courts: " 'In cases of destruction of growing crops, it is proper and important to introduce and admit evidence showing the kind of crops the land is capable of producing, the kind of crops destroyed, the average yield per acre of each kind on the land in dispute, and on other similar lands in the immediate neighborhood, cultivated in like manner, the stage of growth of the crops, at the time of injury or destruction, the expenses of cultivating, harvesting, and marketing the crops, and the market value at the time of maturity, or within a reasonable time after the injury or destruction of the crops And, proceeds that (Utah) court, 'while all such evidence may be considered by the jury in deter-

mining the amount of damages, if any, still the true measure of compensation is the value of the crops in the condition they were in at the time of their injury or destruction.' In *Shoemaker v. Acker,* 116 Cal. 239, 48 Pac. 62, the introduction of such evidence as the means of arriving at value is distinctly approved, and the same proposition is recognized as containing the true element for determining damage in *Ellis v. Tone,* 58 Cal. 289. And that such is the generally accepted rule is abundantly established.—8 Am. & Eng. Enc. Law, p. 330; Jones, Ev. § 384; Sutherland, Damages, §§ 120, 1023; Sedgw. Damages, § 191."

We do not think that there was any error in the rulings of the trial court as to the evidence. The plaintiff was not entitled to the affirmative charge requested, as to any one of the elements of damages. There was evidence sufficient to warrant the jury in finding some damages as to each of the items requested.

We are of the opinion, however, that the trial court erred to the prejudice of appellant in not granting a new trial. We are averse to reversing trial courts for the granting or the refusing of new trials, and do so only under the rules announced in *Cobb v. Malone,* 92 Ala. 630, 9 South. 738.

In this case, however, we think it was made to appear beyond doubt that the verdict was a quotient verdict, that it was agreed on in advance, and that the agreement was carried out to the letter and to a cent. This, we think, is made clearly to appear by the affidavit of the attorney Williams, and it is not rebutted by the affidavit of the juror Powell—which affidavits the reporter will set out in his report of the case. This being true, it was an improper verdict, and the trial court, on appellant's motion, should have set it aside and awarded a new trial. It was shown by the evidence

[International Agri. Cor. v. Abercrombie.]

in support .of this motion that the jurors each wrote down the amount of damages which he thought the defendant was entitled to, that these several amounts were added together and the sum divided by the number of jurors, and that the quotient was accepted and adopted as the amount of the damages, even to a cent. This was shown by scraps of paper found in the jury room in which the deliberations were had, and soon after the jury had retired and before another jury had entered, and by the fact that the writing and the figures were in the handwriting of the jurors or of the foreman.

This evidence was attempted to be avoided by the affidavit of one of the jurors, but his evidence was ineffectual for this purpose. In fact, if his evidence is to be considered, it proves beyond doubt that the verdict was a quotient verdict, and that it was unanimously agreed on in advance. The testimony of the juror (if it can be called such) was that he did not feel bound to adopt the average so ascertained, that if it had not been just and fair he would not have adopted it, and that he did not consider the others bound by it, but that they had a right to object to it, and, in his opinion, would have done so if they had not considered it a fair and just verdict. He, of course, could not testify as to the cognovit of the other jurors, nor as to his own intentions further than as shown by his acts. These acts were that he and the other jurors agreed in advance to a quotient verdict, and that they carried out the agreement to a letter, so far as practicable, even to a cent, and that they returned the verdict so agreed upon in advance.

Of course the jurors thought it was fair and just to do as they did; no one suspects that they intended evil or harm; but it was unlawful and not authorized, and, as has been repeatedly decided by this and other courts, such a verdict entitles either party to a new trial, if

knowledge of its character be brought home to the trial judge in support of a timely motion for a new trial.

The case in hand is a stronger one, for a new trial, than was the *Williams Case,* 113 Ala. 620, 625, 21 South. 328, 329, wherein it was said: "A true verdict is the voluntary conclusion of the jury after deliberate consideration, and it is none the less a true verdict because the respective jurors may have been liberal in concessions to each other, if conscientiously and freely made. A verdict is not a true verdict, the result of any arbitrary rule, or order, whether imposed by themselves or by the court, or officer in charge. If a jury should agree in advance that their verdict should be the result or quotient of a division by 12 of the sum total of all the jurors' separate assessment, a verdict brought about by such an agreement, ought to be set aside. The principle is fully discussed in 28 Am. & Eng. Encyc. of Law, pp. 267-272, and notes. Some of the amounts are placed as low as $25. Others range to $1,500. If jurors should bind themselves to return a verdict, the result of such a method, it is apparent that one or two jurors, by resorting to extremes, could force an unfair verdict. The question for determination by the court is whether, under the rules we have declared, a reasonable and satisfactory presumption arises from the facts stated that the verdict in the case was the result of such an agreement. It is insisted that there is no evidence that the memorandum was made by the jury, and it is further insisted that the memorandum may have been made after the verdict was agreed upon. These are possible conclusions, but they are not probable or reasonable. The memorandum was not made when the paper was delivered to the jury. No one had any right to the papers but themselves. It was made before the jury parted with the possession, and was in the hands of the fore-

man, and returned by him with the verdict into court. A conclusion that the memorandum was made by any person other than a juror, or made after the jury had agreed upon their verdict, or that the verdict was not the result of an agreement, requires too great a draft upon human credulity. We are of the opinion that the verdict was not a true verdict, and should have been set aside. An order will be here made to that effect, and the cause remanded."

The evil effects of a quotient verdict cannot be cured by agreeing thereafter to a slightly different verdict, if it appears that the agreement made in advance entered into or induced the result; nor can a quotient verdict be cured by the jury subsequently adopting it, or its equivalent, as their verdict, if the agreement entered into or controlled the subsequent adoption of the verdict returned. In a Texas Case (*Texas Midland R. Co. v. Atherton* [Tex. Civ. App.] 123 S. W. 704), the motion for a new trial was submitted on an agreed statement of facts. The court in that case said: "It will be seen from the agreement that the jury determined to ascertain beforehand the amount to assess by lot, and that the result should be their verdict. After the lot was cast, there arose a slight difference between them as to the exact amount of the quotient. The difference as to the amount of the quotient being slight, it was moved that the amount be fixed at $6,000. This, to our minds, was clearly an agreement to fix the amount of the quotient that had been arrived at by lot as their verdict, as had been agreed upon between them beforehand, and was not arriving at a verdict by legitimate methods. In *Railway Co. v. Hawkins* [50 Tex. Civ. App. 128] 109 S. W. 221, we said: 'The test in such cases is: Did the jury agree to be bound beforehand by the result of such proceedings? If so, the verdict will be set aside.

But if the result was reached, and no agreement had beforehand to abide by it, and it was afterwards agreed upon as their verdict, it will be sustained.' The verdict in this case, tested by the foregoing rule, is illegal and cannot stand."

In *Whisenant v. Shawe* (Tex. Civ. App.) 141 S. W. 146, the quotient was $1,758, and the jury, abating $8 of that amount, returned $1,750 as their verdict. The court held the verdict to be illegal, saying: "The quotient obtained by the division as agreed upon seems to have been $1,758, but some of the jurors said, 'Cut that off (the $8), and just make it even $1,750,' to which all agreed, and the verdict, as returned and approved by the court, was, 'Account, $751.18, damage $1,750.' Another juror, testifying upon the hearing of the motion, said, 'It was agreed that each man should put down some amount, add them together, and divide by 12, and that would be the verdict on damages.' Yet another juror, testifying on the point said, 'The votes were to be added, the amount divided by 12, and the result was to be the verdict, the damages allowed. The result was $1,758 and something; and some one—I do not know who—suggested that we just make it even money, $1,-750, and it was put down $1,750. * * *' Without quoting further from the testimony, we think it is not to be doubted that it was substantially agreed upon before the division made that the jury could be bound by the result. * * * We attach no weight, as to indicating otherwise, than the fact that the $8 was rejected and the verdict returned in the even amount shown."

In *Ottawa v. Gilliland,* 63 Kan. 165, 65 Pac. 252, 88 Am. St. Rep. 232, the court said: "It appears from this affidavit that it was agreed by the jury that each juror should give the sum to which he thought the plaintiff below was entitled, and that the sum of these amounts

should be divided by the number of jurors; the quotient would be the amount of plaintiff's verdict. This was done; the amount so found was nearly $300, but for the purpose of making the amount an even sum it was increased to $300. This verdict cannot be sustained (citing authorities). After the amount was found by marking, aggregating, and dividing there was no reconsideration. The addition to that amount was not made after a further consideration and the decision of the cause upon its merits, but was for the one purpose of making an even amount. The law demands of each juror an honest consideration of the rights of the parties litigant and the exercise of his best judgment, guided by the law and the evidence of the case. A verdict reached in any other way should be set aside."

We do not think the cases of *B. R. L. & P. Co. v. Moore,* 148 Ala. 115, 42 South. 1024; *B. R. L. & P. Co. v. Clemons,* 142 Ala. 160, 37 South. 925; *Eufaula v. Speight,* 121 Ala. 613, 25 South. 1009, support the ruling of the trial court. The effect of those decisions was not to uphold quotient verdicts. The verdicts in those cases were allowed to stand, because of failure of proof to show that they were quotient verdicts, or verdicts agreed on in advance.

For the error indicated the judgment of the lower court is set aside, and the cause remanded for a new trial.

Reversed and remanded.

DOWDELL, C. J., and ANDERSON and DE GRAFFENRIED, JJ., concur.