NELLIE CARTER, Appellee, v. MARSHALL OIL COMPANY, Appellant.

WITNESSES: Impeachment by Showing Indefinite and Remote
1   Transaction. A witness may not be impeached, as to certain facts testified to by him, by a showing of other facts which are indefinite and uncertain, both as to the nature thereof and as to the time when they occurred. So held where a party tes-

tified as to certain facts in defense of an action for the negligent intermingling of inflammable oils, and plaintiff sought to impeach by a showing of another indefinite and unidentified transaction.

INTEREST:    Past, Present, and Future Accruing Claims.    Interest
2   may not be allowed from the *date of an injury*, when the verdict represents past, present, and future accruing damages: i. e., past, present, and future pain, suffering, and humiliation arising from an injury.

TRIAL:    Confirming Quotient Verdict Agreements.    The invalidating
3   effect of a definite agreement by jurors to do that which would render their verdict a "quotient" verdict, is not avoided by the subsequent action of the jury, after arriving at such verdict, in taking another vote and unanimously agreeing on the amount thereof, or by the addition thereto of interest from a certain date.

*Appeal from Cerro Gordo District Court.*—JOSEPH J. CLARK, Judge.

FEBRUARY 17, 1919.

ACTION for damages consequent on being burned as the result of an explosion, resulted in judgment against the defendant, from which it appeals.—*Reversed.*

*C. H. E. Boardman* and *Henry Curvo,* for appellant.

*Senneff, Bliss & Witwer,* and *E. B. Stillman,* for appellee.

LADD, C. J.—The defendant was engaged in the sale and delivery of kerosene, gasoline, and naphtha, with headquarters at Marshalltown, and had established an agency at Clear Lake, with B. C. Belding as agent. On December 5, 1914, A. E. Carter directed the agent or representative of the defendant company to place in a galvanized, unpainted can on his farm 50 or 60 gallons of kerosene. Fred Gentry had requested him to deliver gasoline at the same place, and Belding loaded in his motor truck such an

amount of gasoline and kerosene as seemed sufficient to fill the two orders. In the afternoon, he drove to Carter's place, where Gentry was working his tractor, and poured 115 gallons of gasoline in the tank, which was empty, and then filled two 10-gallon milk cans with gasoline for Gentry, at Carter's house. This took all the gasoline off the truck, and Belding then took 60 gallons of kerosene from the truck in 2-gallon pails, and poured same into Carter's kerosene tank. There is some controversy as to how the kerosene was purchased, and how much there was. After the oil had been delivered, Mrs. Carter took a small can, then empty, and drew kerosene from the oil tank in it, until three fourths full, and poured enough into three lamps, which were not empty, to fill them, and also filled an oil burner. She then placed the small can, which still had oil in it, in the kitchen, about six feet from the stove, and went to Clear Lake in the evening, to attend church services. In the morning following, Carter arose, and, before dressing himself entirely, started a fire in the kitchen stove. He filled the fire box with cobs, which were rather damp, and then poured oil from a gallon can on them, and applied a match. This was done by removing the lid, which was replaced after starting the fire. In touching the match to the oil, he had noticed no flash or explosion. He put no coal into the stove, and returned the can to the place whence he obtained it. When dressed, he went out to attend to his chores, first calling the plaintiff, who was 15 years old, and her sister, 13 years of age, to get breakfast. From a half to three quarters of an hour after he had started the fire, his daughters came running to the barn, in flames. The plaintiff had looked into the stove, and thought the fire had gone out. She testified that it "looked black, like it always does when cobs burn or, are blackened  *  *  *  I saw the cobs there. I did not see any fire; I don't know whether the stove was very warm. It was not very hot.

I don't know whether I thought the fire had been started or whether it had not, or whether it had gone out. The fire box of the stove was filled with something black." She replaced the lid, and her younger sister took it off again, got the kerosene can, and, holding it about a foot above the stove, began to pour the contents into the stove. Plaintiff was then standing three or four feet back, and, as the oil reached the cobs, there was a blaze, a noise like that of a shot, and the can itself exploded, throwing its burning contents over both girls. The top of the can and the sides were burst open, and the bottom of the can was blown entirely out. The injuries suffered by the younger daughter, Frances, resulted in her death. The plaintiff recovered, though she was seriously and permanently injured. No fuel or cobs appear to have been thrown from the stove, and Carter testified that he observed no fire therein, immediately on coming into the house. A curtain near the stove was burned, and some of the paint on the woodwork was blistered.

Most of the errors assigned are not such as will be likely to arise on another trial, and for that reason, are not reviewed. Because of the errors necessitating a reversal, we express no opinion on the sufficiency of the evidence to sustain the verdict.

I. One Knudtson testified to having been employed by M. Olson & Company during two years prior to September 25, 1915, and that he remembered when some oil was put in the corner tank, and that he made some test of it, on complaint; that this had occurred about a year previous, the trial having begun on February 7, 1915. He was then asked, "Did it flash up or not?" An objection that "it would be immaterial, attempting to contradict immaterial testimony," seems to have been sustained, and he was asked:

1. WITNESSES: impeachment by showing indefinite and remote transaction.

"Well, Mr. Knudtson, you say 'about a year ago.' I find here in this order book that, on the 4th day of December, 1914, that M. Olson & Company got 50 gallons of Search-Light kerosene. What would you say as to whether this instance you speak of was around about that time, or whether it was not?"

An objection as leading and suggestive was overruled, and the witness answered:

"I think it could be that time. Q. Well, is it your judgment that it was around somewheres that time? (An objection as leading and suggestive was sustained). Q. Well, what is your best judgment as to whether it was in the neighborhood of that time? A. Well, my judgment of the time, I would believe it fall, rather than spring, because at that time in testing it, there was little or no snow on the ground,—usually in the spring, there is lots of it. Q. What is your best recollection as to whether it was around December 4, 1914? A. I recollect the instance of this, this oil instance, but not the exact dates. Court: Now he wants you to give the nearest date you do recollect of that occurrence. A. Well, the nearest recollection I could state would be late in the fall,—I could not give any other dates. Q. Well, it is in the late fall of 1914,—of course, it would be impossible for any witness—The Court: You say it was right the next day after he had been to Carter's? Mr. Senneff: No, it would be the day before. The Court: The day before he went out to Carter's? Mr. Senneff: Yes. The Court: Well, he may answer this question, under those circumstances. (Defendant excepts.) Question read by the reporter as follows: Q. Mr. Knudtson, did you, the next day after the tank was filled, see Mr. Belding remove it from the tank? A. He did the next day."

The ruling was erroneous and prejudicial. Evidently, the court accepted Senneff's suggestion that all this happened the day before the explosion in question, but the wit-

ness had not so stated, and the ruling permitted evidence of a distinct transaction, wherein Belding had put oil in the corner tank, and afterwards it was tested by the witness, and some of it was removed on the next day. No connection with the hauling or sale of the oil in question was shown, nor that the time was nearer to December 5, 1914, than late in the fall of that year. This did not tend to contradict Belding's testimony that he could distinguish gasoline from kerosene from the faucet, or that he had heard no complaints as to oil taken from certain carloads, or that he had not removed anything from a tank of the M. Olson Company which had contained gasoline. All appearing was that, after a test, something was removed from the tank. The testimony of Knudtson did not tend to impeach Belding in any material fact, and was objectionable as an attempt to inject into the record evidence that sometime, somewhere, oil of some kind reached M. Olson Company, and, after a test, was, for some undisclosed reason, removed. The evidence should have been excluded.

II. The jury voted to allow the plaintiff $8,666.66, exclusive of interest, and the foreman was directed to sign the verdict for the amount above named, it to draw interest from the time of the explosion. The verdict returned was as follows:

2. INTEREST: past, present, and future accruing claims.

"We, the jury, find for the plaintiff in the sum of $8,666.66, *with interest at 6 per cent from December 6, 1914.*"

The portion in italic was in the handwriting of the foreman. That preceding was the typewritten form submitted by the court. The jury had not been instructed to allow interest. An important element making up the claim for damages was the pain and suffering in body and mind reasonably certain to be suffered in the future, together with the inconvenience and disfigurement of body resulting from her injury. The rule is well settled that, in

such a case, interest may not be allowed *eo nomine. Jacob-son v. United States Gypsum Co.,* 150 Iowa 330. See *Cochran v. City of Boston,* 211 Mass. 171 (Ann. Cas. 1913B, 206). Where plaintiff's damages are complete at a given time, interest may be allowed from that date; but where the damages were not complete at any specific date, and were accruing up to the time of the trial, interest from the date of the injury is not to be included in the verdict. Pain and suffering were endured by plaintiff long after the injury, and that for the future might also have been allowed, as well as the humiliation resulting from the disfigurement. Manifestly, damages were accruing up to the time of the trial, and were to be measured as of that time; and the court erred in computing interest from the date of the injury.

III. Another ground for new trial is that a quotient verdict was returned. Three jurors made affidavits which were attached to defendant's motion for new trial. Two of these, Male and Christiansen, swore that, failing to agree upon the amount to be allowed plaintiff as damages, the jurors agreed that each juror set down some amount between $7,000 and $10,000 he was willing the verdict should be for; that these several sums should be added, and the total amount be divided by 12, and the quotient should be the verdict to be returned; and that this was done, and $8,666.66 was the quotient. This sum, with interest at 6 per cent from December 6, 1914, was the amount allowed in the verdict. The affidavits of Christiansen and Jones disclosed that, subsequently, a vote was taken to see if all were satisfied, and the quotient obtained was unanimously agreed upon as the verdict; and Male added that, subsequently, interest from December 6, 1914, was, by agreement, added. Later on, all the jurors made affidavit that, after some hours of deliberation, the jury had so nearly agreed upon an amount of a verdict that the lowest

3. TRIAL: confirming quotient verdict agreements.

amount voted for was $7,000, and the highest amount $10,-
000; that, at this time, one of the jurors suggested that the
respective amounts voted for be averaged, to see if such an
average would equal an amount upon which all of the jurors
could agree; that thereupon, the said respective amounts
voted for were set down and averaged, and the average
amount equalled $8,666.66; that thereupon, the said amount
of $8,666.66 was discussed, and a vote taken by the jurors
as to whether or not that amount should be the amount of
the verdict; that thereupon, one of the jurors raised the
question as to whether or not that amount should include
interest, or interest should be added thereto from the time
mentioned in the instructions; that thereupon, a vote was
taken by the jury, and it was determined that said amount
should be the verdict of the jury, exclusive of interest; and
the foreman was directed to sign the verdict for the amount
above named, it to draw interest from the time mentioned
in the court's instructions. This affidavit was attached to
the plaintiff's resistance to the motion for new trial.

It will be noted that the affidavit of all the jurors does
not controvert the affidavit of Male that the quotient or
average obtained by the computation "should constitute
our verdict, and should constitute our verdict in the case,"
or that of Christiansen, that "we were to be bound by this
amount as our verdict." This being so, there is no es-
cape from the conclusion that, unless obviated in some man-
ner, the verdict thus reached was what is known as a "quo-
tient verdict." *Gutfreund & Co. v. Williams,* 172 Iowa 535.
The jury, however, had the right to retrace their steps and
repudiate their improper conduct if they chose. *Thompson
v. Perkins,* 26 Iowa 486. Thereafter, interest on the aver-
age sum was agreed to be added, and the jurors then voted
"according to our agreement made in advance," which was
carried unanimously, as sworn to by Christiansen; and
Jones swore that "another vote was taken to see if every

juror was satisfied with the former agreement of determining the amount of the verdict, and every juror voted unanimously in favor of the prior agreement for reaching the verdict, and the manner in which it was obtained."

The affidavit of all the jurors was that, after the average amount had been ascertained, it ($8,666.66) was discussed, and a vote taken as to whether that amount should be the amount of the verdict. This was no more than a ratification of what had preceded, and the average amount stood on another vote to add interest. The illegal conduct in reaching the amount of the verdict to be returned was not repudiated or abandoned, but rather confirmed, by what followed. The evil of a quotient verdict cannot be cured by agreeing thereafter to a slightly different verdict, if it appears that the agreement made in advance entered into or induced the result; nor can a quotient verdict be cured by the jury's subsequently adopting it or its equivalent as their verdict, if the agreement entered into or controlled the subsequent adoption of the verdict returned. *International Agri. Corp. v. Abercrombie,* 184 Ala. 244 (49 L. R. A. [N. S.] 415). A subsequent assent to the verdict is not sufficient to purge its illegality. *Sylvester v. Town of Casey,* 110 Iowa 256.

There was no subsequent reconsideration of the amount of the damages to be allowed. The later votes on the verdict, without any review on the merits, adopted the result attained by the illegal process of adding the several amounts and dividing by the number of jurors, in pursuance of an agreement to be bound thereby. No one could tell in advance the damages so measured to be allowed. These were fixed by chance, through an arbitrary, self-imposed rule, instead of a conscientious and deliberate consideration of the merits by each juror. Such a verdict is by chance, for no juror is apprised what sum his fellows will set down, and the verdict is not the product of his judgment. Had there

been no agreement in advance to abide by the result of the computation as the amount of the verdict to be returned, the matter would have been left open to choice, and each juror left free to accept or reject the result, and the outcome regarded as the conclusion of each juror. As there was an understanding in advance that the verdict was to be reached in the manner described, and no evidence of its repudiation, as must have been clearly proven (*Thompson v. Perkins,* supra), and the subsequent finding of a suffi- cient verdict, the court erred in not granting a new trial. —*Reversed.*

EVANS, PRESTON, and SALINGER, JJ., concur.