NORTHERN INDIANA PUBLIC SERVICE COMPANY *v.*
W. J. and M. S. VESEY.

[No. 26,630. Filed March 26, 1936. Rehearing denied
July 1, 1936.]

342

*Clyde H. Jones, Leigh H. Hunt, James M. Barrett, Jr.,* and *Phillip M. McNagney,* for appellant.

*Vesey & Shoaff,* for appellee.

TREMAIN, J.—This is an action filed by the appellee against the appellant for damages and injunction. The complaint is in four paragraphs. It is alleged that appellant is engaged in the manufacture and distribution of artificial gas, serving the city of Ft. Wayne and surrounding cities and territory; that appellee operates large greenhouses in which are grown and produced flowers, plants, and bulbs of many varieties; that the

properties of the parties are located on adjoining tracts of land; that appellee has operated its plant since 1910, and that appellant has operated its gas plant since 1925, and has operated it .in a negligent manner so that it constantly emits large quantities of smoke, steam, ammonia, poisonous gases, vast quantities of soot, dirt, grease, and vile odors; that said poisonous gases, smoke, steam, soot, etc., are blown over, upon, and into appellee's greenhouses, and by reason thereof the buildings and equipment, plants and flowers of the appellee are injured and damaged; that without appellant's plant so situated and operated, the market value of appellee's property is $175,000, but with such operation, the property is not worth more than $25,000; that the odor from the gas plant is injurious and offensive to the persons employed in the greenhouses and interferes with their comfort and ability to work; that by reason of all of which the appellee is damaged in the sum of $150,000; that if said condition continues, the appellee is and will be irreparably injured and damaged, all on account of the fault and negligence of appellant, and without any fault or negligence upon the part of the appellee; that appellee is without any adequate remedy at law, and is entitled to have said unlawful acts restrained and enjoined, and judgment for $175,000 as damages.

There are general averments in the complaint as to the proper and improper methods of constructing, maintaining, and operating the appellant's plant. A full description is alleged as to the effect of all of these gases, poisons, acids, smoke, steam, and soot upon the buildings and plants.

In their briefs and in the oral argument, both appellant and appellee apparently agree that paragraphs one, two, and four of the complaint are based upon the negligence of appellant in operating the gas plant. The theory of the third paragraph is that appellant's plant,

as operated, is a permanent private nuisance independent of its negligent operation. As to the allegations of the four paragraphs of complaint, it may be said that a trial court might be justified in treating each paragraph as proceeding upon the theory of a permanent nuisance and demanding damages therefor, or they might be treated as proceeding upon the theory of a temporary nuisance which could be abated.

Upon motion of the appellant the cause was venued to the DeKalb Circuit Court. The issues were closed by filing an answer in general denial. A joint request was made for special findings of fact and conclusions of law.

The findings embrace a full description of the appellee's greenhouses and property located in an exclusive residential district until appellant's gas plant was erected. The greenhouse plant was originally erected in 1892 by Mrs. Vesey, who operated the same until her death in 1910, when the appellee corporation was organized. The corporation enlarged the plant and continued its operation to date of trial. Until the erection of the gas plant there was no manufacturing industry of any kind emitting poisonous gases, smoke, acids, etc., near the greenhouses. It was a desirable location for growing plants and flowers. Appellee operates twenty-six large greenhouses, and in addition grows many plants and shrubs outside the greenhouses. The flowers grown consist of roses, carnations, chrysanthemums, orchids, lilies, and potted plants; many other varieties of flowers are grown for commercial purposes and profit.

In 1903 the predecessor of appellant owned a narrow strip of land on the north side of the appellee's property, separated by a railway right of way. A pipe line for the transmission of natural gas extended over said strip of land. More land adjacent thereto was acquired in 1924 for the purpose of erecting a plant to manufac-

ture artificial gas. Upon learning of the proposed change, the appellee notified the then owner, in writing, that it apprehended that a gas manufacturing plant might be harmful and injurious to its greenhouse operations. The plant for manufacturing gas was erected and operation began June 24, 1925; July 7, 1925, appellee again notified the then owner in writing that there was some indication that the gas plant was injurious and harmful to the operation of the greenhouses. Some improvements were made in the gas plant operation. Thereafter, in 1926, the appellant became the owner of the gas property.

The findings fully describe the size and extent of both the greenhouses and the gas plant. The gas plant consists of coal and coke crushing plants in which coke is manufactured and pulverized, a producer gas house, boiler house with large smoke stack, a water gas house in which water gas is manufactured, which is thereafter mixed with coal gas, nineteen coke ovens, quenching tower used for discharging water upon red hot coke as it comes from the ovens, a by-product plant in which are recovered certain elements from the raw gas, purifying boxes, large storages of coal and coke, large piles of iron, ferrous, and foul oxides removed from purifying boxes, and large gas tanks. The coke ovens are heated to two thousand degrees Fahrenheit, a detailed description of numerous ovens, equipments, and subsidiary plants for the manufacture of artificial gas, coke, and by-products are fully described in the special findings. The gas plant is operated continuously for twenty-four hours each day. Certain openings, vents, manholes, and doors are provided in the ovens, stand pipes and other equipment, which afford an outlet for the discharge in the open air of smoke, vapors, and gases containing poisonous substances injurious to plant life.

In the operation of the coke manufacturing plant, large amounts of smoke, soot, raw gas, coke particles, and other emanations are emitted into the open air. From the entire gas plant emanate fumes, smoke, coke particles, grease, acids, not only injurious to plants, but to greenhouses and equipment, and in addition, odors of such vile nature as to make the occupancy of the greenhouses almost unbearable at certain times.

The court finds that a large amount of ammonia is emitted from the gas plant, which permeates the greenhouses and has a killing effect upon plant life and greatly annoys employees therein.

Several pages of the court's findings go into the question of the fumes, gases, acids, ammonia, soot, and oxides of various quantities and qualities, and then recites that these various elements are blown over, upon, and into appellee's greenhouses in such great quantities that the sediment from the same is plainly visible to the eye, and the odor is very offensive; that the effect upon all vegetation is killing and destructive; that when there is not sufficient breeze to blow away said contents, it hangs in a cloud over the greenhouses; that the effect of said substances is to fade and discolor the plants and flowers; that buds and blooms become deformed and unmarketable; that the leaves of the roses are spotted with brownish, black or yellow spots; that carnations fail to open fully; that chrysanthemums are rendered dirty and spotty, and all the plants are covered with coke particles and particles of spent oxides, and are rendered unsalable, and stunted in growth.

The findings describe the condition of the flowers and plants before and after the installation of the gas plant, and describe the destructive nature of the discharges from the gas plant, which serves consumers in the city of Fort Wayne and neighboring towns and cities with gas for both heat and light. There is invested in the gas

plant $3,000,000, and in the greenhouse properties $200,000. The greenhouses cannot be operated normally or profitably while the appellant's gas plant is in operation at the present location.

After the findings make a detailed statement of the number and variety of flowers injured, a statement as to the loss in dollars on each variety, and damages to the buildings and equipment is given and fixed at $82,570.

"The court further finds that defendant's plant cannot be operated in such a manner that it will not continue to emit such poisonous gases, soot, steam, coke particles, smoke, dirt and other offensive substances, offensive odors, and permit the same to flow over and upon and into plaintiff's greenhouses, and damaging plaintiff, as hereinbefore found, and be a nuisance to plaintiff and its property, and unless such nuisance is abated, plaintiff's business cannot be operated profitably, has been destroyed, and its property permanently injured and damaged. The court further finds that public convenience requires that the defendant continue its operations, and pay the plaintiff all damages it had sustained, and does sustain, on account of the permanent operation of the defendant's plant at its present location.

"17th. That the plaintiff has, in the operation of its said business, by reason of the operation of defendant's gas plant, as aforesaid, sustained damage and injury to the flowers and plants raised by it for sale, and damage to the quality thereof, in the sum of Thirty-five Thousand and Seventy ($35,070.00) Dollars, up to the commencement of this action, and the plaintiff has sustained, at the commencement of this action, the further permanent loss and damage to its greenhouses, other structures and equipment other than plants and flowers, in the sum of Forty-seven Thousand Five Hundred ($47,500.00) Dollars."

Upon the findings the court stated its conclusions of law as follows: First, that a private nuisance is created by the operation of appellant's gas plant, and the ap-

pellee has suffered special damages therefrom. Second, that the continued operation of appellant's gas plant will constitute a permanent private nuisance. Third, "That the continued operation of the defendant's gas plant is necessary *in the public interest,* and that less injury will be occasioned by requiring the defendant to pay the plaintiff all of the damage suffered by it up to the time of the commencement of this action, than by enjoining the operation of the defendant's said gas plant, and that the maintenance and operation of defendant's gas plant should not be enjoined." Fourth, that the appellee is entitled to recover damages in the sum of $82,570. Accordingly judgment was rendered against the appellant for that amount.

The appellant excepted to each of the court's conclusions of law and filed a motion for a new trial. The errors relied upon for reversal are: The court erred in its first, second, third, and fourth conclusions of law, and erred in overruling appellant's motion for a new trial.

The first question relied upon and discussed by the appellant in this court is the alleged error of the trial court in its second conclusion of law: That the continued operation of appellant's gas plant constitutes a permanent private nuisance from which appellee suffers special damages.

The court found that during the years 1926, 1927, 1928, and 1929, appellee's flowers and plants, buildings and equipment were damaged and injured by poisonous gases, fumes, soot, acids, etc., emanating from appellant's plant, in the sums above stated; that the poisonous emissions from appellant's plant continued to increase in quantity and frequency, and by reason thereof, the plants, greenhouses, equipment, and physical property were, at the beginning of this action, permanently

and irreparably injured and damaged, as shown by the last part of the court's findings copied above.

The court's third conclusion of law stated that the continued operation of the gas plant is necessary in the public interest; that less injury would be occasioned by requiring the appellant to pay the appellee all damages suffered by it at the time of the commencement of the action, than by enjoining the operation of the gas plant; and that the maintenance and operation of the gas plant should not be enjoined. In other words, the trial court by that conclusion established the operation of the gas plant, as then operated, as. a permanent legal right in appellant, which the appellee is precluded forever from abating through process of law. Under such circumstances the operation of the gas plant, in legal effect, becomes a permanent nuisance. The gas plant in itself is not a nuisance, but the manner of its operation is a nuisance. Unquestionably, under the facts and findings, the appellee's greenhouses, equipment, flowers, and plants suffered injury from the emissions of the gas plant. As stated in *The City of Lafayette* v. *Nagle* (1888), 113 Ind. 425, 430, 15 N. E. 1:

> "There is a plain distinction between an unlawful act constituting a nuisance and an act wrongful because the authority of the person by whom it is done has been exceeded. There is an equally plain distinction between a mere transient trespass and an act which both litigants treat as of an enduring character."

Since the court found in finding Number 16 that the appellant's gas plant cannot be operated in such manner as not to emit the poisonous and destructive gases, or in such manner as not to injure appellee's plants and flowers, and since the court found that it would be of less damage to permit the gas plant to continue its operation than to enjoin it, it follows that the gas plant may continue operating in the same man-

ner forever, even to the total loss of the appellee's plant. Under such conditions appellee should be and is entitled to recover all damages due to such continuous operation. *Stein* v. *City of Lafayette* (1893), 6 Ind. App. 414, 33 N. E. 912; *Chicago, etc., R. Co.* v. *Myers* (1914), 57 Ind. App. 458, 105 N. E. 645, 107 N. E. 296.

The latter case discusses the proposition that damages may be recovered on account of a temporary nuisance, of a permanent nature, and that the trial court may assess damages for the permanent injury.

The operation of the gas plant constituted a public and private nuisance. *Reed* v. *Cheney* (1887), 111 Ind. 387, 12 N. E. 717; *Zeppenfeld* v. *Franklin Motor Service Co.* (1922), 77 Ind. App. 687, 134 N. E. 487; *City of Frankfort* v. *Slipher* (1928), 88 Ind. App. 356, 162 N. E. 241; §§2-505, 2-506, 2-507, Burns 1933, §§57, 58, 59, Baldwin's 1934.

Injury to the growing flowers and plants for a single year, generally speaking, cannot be regarded as a permanent injury to the property, but in the case at bar, where the appellant has invested a large sum of money and is engaged in furnishing the public with artificial gas for heating and illumination purposes, and the court in the exercise of its legal right, determined that it would be a greater loss to remove the gas plant than to pay damages to the appellee, the law permits the appellee to prove damages which are the proximate result of and were caused by the appellant's operation of its plant. If the appellee's buildings and equipment were injured and damaged, and the court finds that they were, such injury would be of a permanent nature, but if a certain growing plant is wilted and blighted, such injury ordinarily would be temporary. All such injuries of whatever nature may be considered together, under proper measure of damages as to each, in determining the amount of appellee's

recovery in a case of the nature here considered. The manner of the operation of the gas plant created a nuisance under the findings of the court, and that nuisance by the same findings and judgment is permitted to stand and to continue for all time to heap injury upon the appellee's property. It is reasonable that appellant should respond in damages in one sum in order that appellee will not be compelled to file and maintain from time to time a series of actions for damages. This proposition is based upon the general equitable principle that equity will give full relief in one action. *City of Harrisonville, Mo. v. W. S. Dickey Clay Mfg. Co.* (1933), 289 U. S. 334, 53 S. Ct. R. 602, 77 L. Ed. 1208.

The fact that a nuisance is not legally abatable, but, by authority of law, either legislative or judicial, is permitted to exist, is sufficient evidence to presume that it will continue to operate under the same conditions for an indefinite period. The fact that the appellant could desist voluntarily from the manufacture of artificial gas and discontinue the use of its plant does not restrict the rights of the appellee to the recovery of temporary damages only.

The appellant asserts that the special findings of fact show only a continuing temporary nuisance and that permanent damages never arise where the nuisance arose from a continuing cause. This is a general rule which has its exceptions. One exception is that permanent damages are proper where the nuisance, although arising from a continuing cause, cannot be abated because of public interest. If the appellant recognizes this exception, it undertakes to avoid it by asserting that the complaint did not proceed upon that theory, but upon the theory of a temporary nuisance which could be abated, and that there is a variance between the court's findings and the theory of the com-

plaint. The appellant did not test the sufficiency of either paragraph of complaint by motion or by demurrer.

It is alleged in the complaint that because of the appellant's conduct, the market value of the appellee's plants has been depreciated. This allegation proceeds upon the theory of permanent damages and is sufficient to support an award upon that theory. *Chicago, etc., R. Co.* v. *Myers, supra; Miller* v. *Gates* (1916), 62 Ind. App. 37, 112 N. E. 538.

Also, it must be remembered that the third paragraph of complaint proceeded upon the theory that the operation of appellant's gas plant constitutes a private nuisance. Upon that theory negligence need not be pleaded nor is it a necessary element, and such allegation, if any, will be regarded as surplusage. *Niagara Oil Co.* v. *Ogle* (1912), 177 Ind. 292, 98 N. E. 60; *Indiana Pipe Line Co.* v. *Christensen* (1924), 195 Ind. 106, 143 N. E. 596.

The Ogle case was an action for damages on account of the maintenance of a nuisance. It was there claimed that the complaint was defective because there was no averment of the plaintiff's freedom from contributory negligence. The court held that such showing was unnecessary; that it was not an action for damages on account of negligence, but for damages for the maintenance of a nuisance and to enjoin or abate it; and that the rule governing the sufficiency of complaints for damages has no application to such case. Also, it was insisted that where a nuisance can be abated, there can be no recovery for a permanent injury. The court said (p. 300):

> "The complaint alleges and the court finds that not only were the growing crops injured, but, by reason of the deposit of oil and salt water on the land, its productive power was destroyed. Recovery for permanent injury to the land was authorized."

The same allegations are contained in the appellee's complaint: That by reason of the smoke, fumes, acids, and gases emitted from the appellant's gas plant, appellee's flowers were destroyed and its buildings injured and damaged. The injury is continuous, but should not be abated under the findings and judgment of the court. Many other decisions of the courts support this doctrine. In addition to this there is a familiar rule of law that the pleadings will be deemed to be amended to conform to the evidence, findings, and judgment.

The appellant objects because the court ordered it to pay the sum of $47,500 as permanent damages to the greenhouses to the date of the commencement of the action. It then asserts that in case of a continuing *abatable* nuisance, the damages are measured by the rental value and not by the depreciation of the market value of the property affected. This is a true statement of the law, but it cannot apply to this case for the reason that the court refused to abate the nuisance upon the ground of public welfare; and that it is impossible to operate appellant's plant so as not to injure the appellee. Since the nuisance is legally established and not abatable, it will be regarded as continuing and as permanent, and as such, it cannot be abated legally hereafter. This being true, the appellee may recover all damages in one action and, therefore, the measure of damages is the depreciation of the market value by reason of the continuance of a permanent nuisance. *City of Lafayette* v. *Nagle, supra; Stein* v. *City of Lafayette, supra; Porter* v. *Midland Ry. Co.* (1890), 125 Ind. 476, 25 N. E. 556; Harper on Law of Torts, §194, p. 390.

When the trial court refused injunctive relief to the appellee upon the ground of public interest in the con-

tinuance of the gas plant, it properly retained jurisdiction of the case and awarded full compensation to the appellee. This is upon the general equitable principle that equity will give full relief in one action and prevent a multiplicity of suits. *Miller* v. *Gates, supra; Chicago, etc., R. Co.* v. *Myers, supra; City of Harrisonville* v. *W. S. Dickey Clay Mfg. Co., supra.*

Much evidence was introduced in the trial concerning the production of artificial gas and by-products, and concerning the management and operation of the greenhouses. Many experts testified for both plaintiff and defendant; detailed analyses of the fumes, acids, and gases emitted from the gas plant were given. The taking of evidence required five weeks in court. Very little was left to be said upon either side of the law suit relative to the operation of the two plants and the products of each, or upon the measure of damages. The findings are supported by evidence which this court cannot disturb.

The appellant objects to the court's first conclusion of law in which it held that the appellee suffered special damages because, it says, the findings failed to show the existence of a nuisance. It will be admitted that the manufacture of artificial gas for public use is not a nuisance *per se*. It is equally true that the emission of noxious gases and fumes from the gas plant which endangers health and damages property of those in close proximity with the gas plant, thereby rendering the property of less value, does constitute a private nuisance for which damages may be recovered, or injunctive relief granted. 20 R. C. L. 453, §67; *The Terre Haute Gas Co.* v. *Teel* (1863), 20 Ind. 131.

The permanent interference with the appellees rights, here shown, is a nuisance. If the owner suffers a pe-

culiar and particular injury, different from that of the public generally, such owner may maintain an action for damages and to enjoin the maintenance of the nuisance. When the injury interferes with the appellee's rights, if allowed to continue, it will depreciate the rental value of appellee's property, and, also its market value, and damages may be recovered to the commencement of the trial. Appellee's complaint does not recognize the right of the appellant to maintain the nuisance, but demands its removal. All that the court was required or authorized to find, under the facts, was the amount of appellee's damages to the commencement of the trial, and what effect, if any, the continuance of said nuisance has on the value of the property. *Martin* v. *Marks* (1900), 154 Ind. 549, 556, 557, 57 N. E. 249; *Indiana, etc., Ry. Co.* v. *Eberle* (1887), 110 Ind. 542, 11 N. E. 467.

The case of *Martin* v. *Marks, supra,* was based upon a permanent obstruction of a highway along the plaintiff's property, which constituted a nuisance. In discussing that question on page 556 of that case, the court said:

"The facts stated in the special finding show that the fence was built in the public highway in front of appellees' real estate, which abutted thereon, and that said fence materially impaired and interfered with their means of access thereto, and that the result of the impairment and interference with such right, if allowed to continue, will be the depreciation in the annual rental value of said real estate, and also its market value, and that appellees' damages up to the commencement of this action are $25. Such facts show that appellees have suffered a peculiar and particular injury different in kind from that which is suffered by the community in general. (Citing authorities.)

"As this action was to recover damages for said obstruction, and compel its removal and enjoin its continuance, it was not necessary or proper for the court to find the amount said real estate was dam-

aged by said obstruction upon the theory that it was permanent. . . . All that the court was required or authorized to find was the amount of appellees' damages to the commencement of this action, and what effect, if any, the continuance of said nuisance would have on the value of said real estate."

In the case at bar it is evident that the nuisance would have been abated by the trial court had it not been for the fact that the gas plant supplied a large community, and public interest therefore required that it should not be abated. When judgment was rendered to that effect, the nuisance then became permanent and could not be abated thereafter by legal proceedings, unless such proceedings were based upon a new ground.

In *The Indiana, etc., Ry. Co.* v. *Eberle, supra,* in a discussion of this question, the court said (p. 551):

"Whether the plaintiff may recover for the permanent depreciation in the value of his property, depends upon the permanent character of the injury, and the frame of the action. Where the character of the injury is permanent, and the complaint for damages recognizes the right of the defendant to continue in the use of the property wrongfully appropriated, and to acquire *as a result of the suit,* the plaintiff's title to the right appropriated, we can see no reason why the damages may not be assessed on the basis of the permanent depreciation in value of the property injured. . . ." (Our italics.)

The appellant asserts that the damages awarded are excessive and are predicated upon the average yearly market value. It calls attention to the fact that by finding Number 13 the court found that 2,700,000 roses were produced by the appellee from October 1, 1927, to November 1, 1929, the date the action was filed; that 370,000 roses had been damaged and injured by poisonous emissions from appellant's gas plant; that the damaged roses were not worth, at market value, over one-half cent per flower as culls; and that if they had not

been damaged they would have been worth at market value eight cents each. The appellant asserts that such yearly average market value of good roses is unfair; that the books of the appellee show the greatest loss in the number of roses to be at times when the prices were lowest, and submitted a table to verify such assertion. On the other hand, the appellee submits a table of roses cut and sold, and the loss for other months, which shows that the yearly average market value was unfair to it.

If the appellee is legally entitled to damages, it cannot be denied upon the ground that the measure of damages is difficult to ascertain. From the 370,000 roses injured and damaged and reduced to a value of not more than one-half cent per flower, the trial court made a deduction. If those roses had not been damaged and were of a market value of eight cents each, the total value would have been $29,600. The court allowed $27,750 as the loss on the damaged roses. Evidently the court made a reduction of $1,850 because of finding Number 7, wherein the court found as a fact that prior to the establishment of the appellant's gas plant in close proximity to the appellee's greenhouses, the appellee had produced flowers and plants of high quality and high productiveness, and that not to exceed four per cent of those produced were of poor quality. It may be stated fairly that the trial court, in fixing the damages upon the roses at $27,750, took into consideration the fact that the evidence disclosed that four per cent would have been damaged if appellant's gas plant had not been located as described in the findings.

Appellee asserts that the undisputed evidence shows that during the period of time damages were calculated from October 1, 1927, to November 1, 1929, the number of cull roses was 570,054. This number is not disputed by the appellant in its reply brief. It was answered by

stating that the appellant was bound by the findings which disclosed the number to be 370,000. It must be remembered that the appellant by its motion for a new trial questioned the findings and brought before the court all the evidence in the case. Upon the basis of 570,054 damaged roses, the court would have been warranted in allowing damages for 100,000 more injured roses. Considering the great number of roses produced, it was not practicable, and it cannot be expected, that the appellee should keep a record of each individual rose. The 100,000 for which the court allowed no damages to the appellee may be taken also as the basis used by the court in giving credit to the appellant for roses that would have been injured from causes other than the appellant's gas plant. There is ample evidence to justify this finding because it was established that there was a market for them except during the latter part of June and September. The court allowed no damages for 100,000 culls in excess of the normal number of culls under normal conditions.

Without extending this opinion as to other varieties of flowers and plants produced, it may be said that the court followed the same general method as was followed in reference to the roses. No damages were allowed by the court for future losses caused by the gas plant, but all damages were based upon losses sustained prior to the date of the commencement of the action.

Appellant asserts that damages cannot be awarded because they are speculative. The fact must not be overlooked that the damages awarded accrued prior to the commencement of the action—$47,500 to the greenhouses and $35,070 to flowers. Nothing was allowed for damages accruing thereafter. The appellant asserts that such allowance amounted to double damages for the same injury. This cannot be true because the greenhouses and equipment suffered a loss

different in kind from the loss and injuries suffered as to the flowers and bulbs.

The appellant claims that the damages allowed for the depreciation in the greenhouses and equipment were excessive because in the case of a continuing *abatable* nuisance, the measure of damages is the diminution in rental value and not the depreciation in market value. This is a correct statement of the law, but it does not apply to this case for the reason that the court found that in the interest of the public the agency causing the damages was *nonabatable*. In *International Agricultural Corp.* v. *Abercrombie* (1913), 184 Ala. 244, 253, 63 So. 549, 49 L. R. A. (N. S.) 415, it is held that where growing crops are injured from fumes and gases, testimony of experts is admissible as to the amount of crops which would have been produced except for the alleged fumes and gases; that such experts may give full and complete descriptions of the effect of such gases and the condition of the plants or crops; and that all such testimoney is admissible not as showing the measure of damages, but as furnishing a basis from which to ascertain the amount. The measure of damages is the difference in yield and the value of the crops or plants with and without the presence of the fumes, and evidence concerning the same is admissible for the purpose of showing the necessary elements which enter into the amount of damages suffered, or as a basis from which to ascertain the amount of the damages.

The case just cited quotes from the notes in 140 Am. St. Rep. 309, as follows:

" 'The questions of the measure of damages for injuries to growing crops and of the manner of estimating damages in such cases are not altogether devoid of difficulty. The courts are not agreed upon the subject, and the cases are in more or less confusion. This confusion arises partly from a difference in the rules applicable to the measure of damages for injuries to growing crops, and in the

various holdings of the courts as to what evidence is admissible in such cases, and partly from the way in which various propositions of law as well as of fact are stated. These differences, added to the inherent difficulty of estimating the value of a growing crop, create some misgiving in the formation of general rules respecting the subject. There is no doubt, however, that compensation for the real injury is the purpose of all remedies. . . . The inquiry should therefore be, in each case, how much was the plaintiff injured by the loss or destruction of his crop? This proposition is undisputed, but the courts, in arriving at the value of a growing crop, resort to several methods of computation, and either or all combined may afford a fair basis.' "

In the case at bar the evidence and the findings disclose that a large number of many varieties of plants and flowers were injured and damaged by fumes from the appellant's gas plant. Some were entirely destroyed and others damaged in varying degrees over a period of two years and three months. It is seen readily that difficulty arises in ascertaining the exact and precise amount of damages sustained. A full and detailed description given by witnesses is necessary in determining the value of the plants damaged and injured, not as a measure of value, but as evidence to enable the court to determine the value of those injured and destroyed. As stated in *Teller* v. *Bay & River Dredging Co.* (1907), 151 Cal. 209, 214, 90 Pac. 942, 12 L. R. A. (N. S.) 267, 12 Ann. Cas. 779:

" 'In cases of destruction of growing crops it is proper and important to introduce and admit evidence showing the kind of crops the land is capable of producing, the kind of crops destroyed, the average yield per acre of each kind on the land . . .' "

The term "average yield per acre" in meaning is similar to the method used by the trial court in this case when it took the average yearly production of the greenhouses. This method recognizes that the true measure of

compensation is the value of the plants and flowers in the condition they were at the time of their injury. Upon this question the Abercrombie case, *supra,* holds that " 'the introduction of such evidence as the means of arriving at value is distinctly approved, and the same proposition is recognized as containing the true element for determining damage in *Ellis* v. *Tone,* 58 Cal. 289. And that such is the generally accepted rule is abundantly established.' " (Citing authorities.)

The case of *Bigbee Fertilizer Co.* v. *Scott* (1911), 3 Ala. App. 333, 56 So. 834, contains facts similar to those in the case at bar. A fertilizer plant had been established near the gardens and orchards of a truck farmer. The fumes and gases from the factory, alleged to be a nuisance, injured and destroyed many varieties of growing truck and fruit, for which damages were demanded. The principal question involved in the litigation was the ascertainment of the correct rule for the measurement of damages. It was there asserted that the correct rule for ascertaining the damages for the destruction of growing crops is the value of the crops at the time they are destroyed. This rule is announced by many Indiana authorities. It was claimed that this was the only rule for the measurement of such damages. It is pointed out in the Alabama case that such rule is the correct method of ascertaining the damages suffered by the owner of growing crops destroyed or injured at a fixed period of their growth. The court then stated (p. 342) :

> "The facts of the present case are entirely different from those which were under consideration in the cases of . . . and present an entirely different question for our determination. In this case there was a constant application of a deleterious substance upon appellee's crops from the time they were planted, stunting them in their growth, retarding their maturity, and materially decreasing the quantity and value of their yield."

That opinion then discusses speculative damages, reviews other authorities, and then states that the case did not contain any of the speculative features. The suit was filed at the time of the year after the crops had been planted and injured, and then says (p. 344):

> "While there was not that identical certainty about the difference in the yield of the various crops near the lands of appellee which were and which were not subjected to the influences complained of . . . nevertheless, if appellee's evidence is to be believed, her damages at the hands of appellant were actual and measurable, and not merely speculative. Some of her evidence tended to show that she suffered greater damage than some of her other evidence; but all of her evidence tended to show that her damages were not only substantial, but were susceptible of estimation with reasonable certainty. . . . Certainly a tort-feasor should not be permitted to escape liability because the court may find difficulty in declaring a perfect measure for the damages which have been suffered by reason of the tort."

Poisonous gases and fumes were discharged into the air by the appellant's gas plant which operated twenty-four hours in the day. Twenty per cent of the time it was in operation, the findings disclose, the fumes were blown over, into, and upon the appellee's greenhouses. The damages and injuries were continuous, and, as the court found, constituted a private nuisance, but the court considered that because it served gas to the city of Fort Wayne and surrounding territory, it would be a greater injury to the public to abate the nuisance than to give a perpetual license to operate and pay damages to the appellee. This was done. By the judgment of the court it is now nonabatable and may continue in the future as in the past under conditions, if this court is to believe the evidence and findings of the trial court, that will eventually destroy the usefulness of appellee's plant.

The appellant has made the point that the books of the appellee disclose that appellee enjoyed greater profit from its greenhouses after the erection of the ■ gas plant than it did before its erection. This assertion does not take into consideration the inventory of the appellee before and after the erection of the gas plant. One item alone concerning improvements and extensions is that the appellee expended $20,000 improving its plant in 1926, and enlarged its output by rental of adjoining land. Therefore the fact, if it be a fact, that appellees did receive greater profits after the erection of the gas plant is not controlling.

The appellant complains of the ruling of the trial court upon the refusal to permit a witness to answer a certain question, and has assigned that ruling as ■ Specification 21 in the motion for a new trial. That specification is as follows:

"The court erred in sustaining plaintiff's objection to the question asked the witness, Edward A. White, on cross-examination: 'Have you any objection to having me look at them?' and in refusing to permit the witness to answer said question, the following question and answer having been asked and answered by said witness immediately prior thereto: 'Q. Have you, Dr. White, the notes on which you testified yesterday? A. I have them in my brief case,' and in refusing to permit the defendant to examine said notes."

The appellant, in this assignment, does not show what other questions preceded the one to which objection was sustained. A similar question was presented to this court in *The Trustees of the Wabash and Erie Canal* v. *Bledsoe* (1854), 5 Ind. 133. The court there used the following language (p. 136):

"Objection was made because a witness was permitted to make a reference in his testimony to books, without producing them. The books contained certain *memoranda* made by the witness, and were not, so far as appears, admissible in evidence.

The witness seems only to have used them to refresh his memory, not as evidence of themselves, and we see nothing improper in the ruling of the court."

A similar situation arose in *Lennon* v. *United States* (1927), 20 Fed. (2d) 490, where a witness testified from a memoranda which appears to have been made by the witness, but which was not in court while the witness was on the stand. The witness frequently refreshed his memory by referring to the papers and relied upon his recollection. It was held that it is only where the witness uses the paper to refresh his memory while on the stand that there is a right to compel a production of the writing for inspection.

It is clear from the assignment in the motion for a new trial that the witness White did not have the memoranda with him at the time the question was propounded, but it was in his brief case. There is no showing as to the location of the brief case, nor as to the character of the memoranda, nor as to its relevancy to the issue joined. It may have been a private matter of confidential nature to which the appellant was not entitled. The court did not commit reversible error in sustaining the objection to the question.

The next assignment is that the court erred in sustaining an objection propounded by the appellant on direct examination to its witness, Mr. Kunkle, as follows:

"Where did you go?"

In response to the question the appellant offered to prove that the witness went to Yonkers, N. Y., and visited greenhouses which had been growing roses for many years; that he made observations, and from his investigation found that the same condition existed in the greenhouses in Yonkers, with reference to the discoloring of roses and distortion of flowers and buds,

that he found in the Vesey greenhouses; and that such condition was due to weather conditions, lack of sunlight and other climatic conditions. An examination of the witness's testimony discloses that he qualified and was permitted to testify fully as to all the conditions existing in the appellee's greenhouses, and to give a full description of the condition of the flowers and plants. In testifying as to his observations and examinations of the appellee's greenhouses, the witness based his opinion upon the actual condition found, all of which was based upon his experience as an expert. This was as far as the witness was permitted to go. He could not be permitted to make a comparison of the conditions existing in the appellee's greenhouses with those existing in the greenhouses at Yonkers, N. Y. This is true where the witness is testifying in chief as appellant's witness. The rule would be different if he were being cross-examined, but that is not the case. In addition to this, the comparison, which the appellant sought to have this witness make, was between greenhouses remotely located. A great many conditions might arise which would differentiate the Yonkers plant from the one at Fort Wayne. It is not shown whether the plant at Yonkers, N. Y., was subjected to the fumes and poisonous gases emitting from the manufacture of artificial gas. It may have been as far as the question shows.

The proffered testimony is much broader than the question, and includes a statement of much more than an answer as to where the witness went. There is no error in sustaining an objection to the question.

Appellant's witness, Dr. Zimmerman, while testifying in chief, was asked this question by the appellant:

> "Then in your opinion, Dr. Zimmerman, could a human being live in this concentration of illuminating gas of one to five hundred parts of air, if he remained for eight days in the concentrations you have described?"

The following offer to prove was made by the appellant:

"The defendant offers to prove by the witness on the stand in answer to the question propounded, if the witness be permitted to answer, that human beings could not live in concentration of gas in proportion of one to five hundred parts of air, which concentration the witness has testified would not give any response to the cyclamen plant."

The record discloses that Dr. Zimmerman testified as an expert horticulturist. He testified fully, before this question was propounded to him, upon what the effect of illuminating gas of one to five hundred parts is upon a cyclamen plant; that he had made experiments; and that such gas did not injure a cyclamen plant. There is no showing that he had qualified to express an opinion as to whether such gas would be fatal to human life. He did not qualify upon any subject other than horticulture. In addition to this, it was proposed to prove in answer to the question, that such gas would be fatal to a human being and not injurious to the cyclamen plant. At most this testimony was cumulative as to what the doctor had previously testified.

Specification 150 of the appellant's motion for a new trial questions the ruling of the court in refusing to permit appellant's witness, an expert, on direct examination, to answer a question, as to whether or not the concentration of gas and vapor would be greater at any time inside the greenhouses than it was on the outside. The offer to prove was an answer in the negative. This offer was made upon the theory that it contradicted the evidence given by the appellee's witnesses to the effect that the gases and vapors would be greater inside the greenhouses than on the outside. The record discloses, and it is not denied by appellant, that appellee's witness testified that the "smell" cleared quicker outside than inside—not the concentration of gas and vapor. In any event this court cannot say that

the ruling of the trial court was so vital as to constitute reversible error.

The appellant contends that it was error for the trial court to permit appellee's witnesses, on direct examination, to answer a question as to what was the fair, reasonable market value of its greenhouses and equipment on November 1, 1929, exclusive of the flowers and plants growing therein, if the gas plant was not located in close proximity thereto, and if the air was free from any gas, vapors or contaminations from the gas plant; also, the fair, reasonable market value on the same date, with the gas plant so located. It asserts that the measure of damages, in case of a continuing *abatable* nuisance, to physical property, not actually destroyed, is the diminution in the rental value and not the depreciation of the market value; that even though the correct measure of damages is the depreciation in the market value of the property affected, the true rule is the difference in value of the property before and after the erection of the gas plant, rather than the value at the time of the commencement of the action.

These propositions are well sustained by authorities in cases where they are applicable. Appellant's proposition is predicated upon the hypothesis of a continuing *abatable* nuisance. From the findings of the court it is clear that the gas plant would have been abated as a nuisance except for the interest of the public in its maintenance. The trial court found that the appellant should respond in damages once and for all. Upon the issue joined it was proper for the court to receive evidence upon the theory that the nuisance was nonabatable and was permanent, in which event the measure of damages was the depreciation in the market value and not the diminution of the rental value.

The measure of damages could not be fixed as of the date of the construction of the gas plant for the reason

that the plant was not a nuisance *per se*. The damages arose from the manner of its operation. There was no damage at the time of its construction. The damaging effect of the gas and fumes emitted from the operation appears to have grown and increased gradually as the capacity of the gas plant increased. When the damaging effect was first observable, it was not known definitely that the injuries came from the gas plant. When it was determined that it emanated from that source, changes were made in certain respects in the gas plant, and every effort was made to eliminate the effect of the gases and fumes upon the flowers and plants. The evidence showed this to be unavailing, and the trial court found that the gas plant could not be operated without the emissions of the gases and fumes, and received evidence of the market value of the greenhouses at the date of the filing of the complaint upon the theory of a permanent nuisance. If the permanency of the nuisance had been apparent at the time of the construction of the gas plant, the rule contended for by the appellant would have been applicable. Since it was neither apparent nor contemporaneous with the construction of the gas plant, the measure of permanent damages is the difference in value immediately before and after the injuries became complete. *City of Amarillo* v. *Ware* (1931), 120 Texas 456, 40 S. W. (2d) 57, 61; *Missouri, K. & T. Ry. Co. of Texas* v. *Dennis* (1905), (Tex.), 84 S. W. 860; *City of Ottumwa* v. *Nicholson* (1913), 161 Iowa 473, 143 N. W. 439; *Rosenthal* v. *T. B. & H. Co.* (1891), 79 Tex. 325, 15 S. W. 268.

In the first case cited the Texas court had before it a question of injury to real estate caused by a system of storm sewers constructed by the appellant, in which the damages recurred from time to time, and which constituted a permanent nuisance. The court held that where

the nuisance is permanent and the injuries constantly and regularly recurring, then the whole damage may be recovered at once; that the measure of damages was the resulting depreciation in the value of the property injured thereby. In that case it was shown that the injuries recurred at each considerable rainfall and continued during a stage of offensive stagnation until the water evaporated. The damage was treated as permanent, as was the damage so treated by the trial court in the instant case. A long line of authorities is cited holding that in such case, the measure of the damages to the plaintiff's land was the difference in the reasonable market value thereof immediately before and after the injuries.

The second case cited also is a Texas case and grew out of the maintenance of a large pool and lake from which offensive odor was emitted to the injury of the plaintiff. It was there held that the construction and maintenance of such pool created a nuisance for which recovery could be had, and the measure of the damages was the difference in the value of the property immediately before and after the injury, and not at the time of the erection of the pool, since the injury did not occur until the water stored therein receded, allowing the vegetation killed thereby to decay and give off offensive odors, or, as said by that court "at the time of the trial."

The third case cited is by the Iowa court and was maintained for the purpose of recovering damages on account of a nuisance created by the defendant. It was there held that where damage to land by the maintenance of a nuisance is original in that the injury is contemporaneous with the wrongful act, the measure of damage is the difference between the reasonable market value of the property immediately before the condition resulting in the injury was created and immediately thereafter, and, if the injury is not contemporaneous

with the creation of the condition, the measure is the difference between the value immediately before and immediately after the injury.

It is clear that the trial court, in receiving the evidence objected to, treated the injury to appellee's greenhouses as permanent and received the evidence objected to upon that theory. There was no error in receiving this evidence.

Another objection went to the testimony of appellee's witness upon the subject of the proper method of piling and handling spent oxide to avoid the creation of sulphur gases. This witness was an expert chemist. The objection was that he was not qualified to testify upon that subject; that the appellant's witnesses, experienced in that line, had fully described the proper method of piling that material. The objection went properly to the weight of the testimony rather than to its competency.

Another objection by the appellant was the alleged error of the court in striking out part of the answer of the appellant's witness, Arthur, concerning the ventilation of the greenhouses.

"Q. What did you observe about the ventilation of these houses, that is, the character and efficiency of it? A. The ventilation of the houses consisted of one-way ventilation and some houses with two-way ventilation. The houses with one-way ventilation are not adapted to the growth of good roses."

The last sentence of the answer was stricken out by the court. It is not responsive to the question, and could have been shown by the proper questions. There is no error in this ruling.

The witness was asked the further question concerning conditions around Fort Wayne:

"Q. Just tell the court what the conditions were. A. The roses were faded wherever they were grown. The growers were expe-

riencing the same difficulties of growing during that period of weather. They were—"

The answer was stricken out. Thereafter the witness was permitted to testify in detail concerning the condition of the flowers at that time as he had found them in other greenhouses around Fort Wayne. The error, if any, was cured by other questions and answers.

The appellant introduced another witness who testified relative to the acidity value of the soil in another locality in the city of Fort Wayne, and then was asked this question:

"And what was the result?"

to which objection was sustained. This witness gave full testimony as to the experiments made by him of soils collected in appellee's greenhouses and his determination as to the relative acidity value of such soil, and, upon his studies and experiments he stated that the soil contained too much alkaline. Therefore, it was not necessary nor proper for him to state what condition he may have found in other greenhouses not belonging to the appellee.

Another witness was asked a question pertaining to the effect of hot weather on certain bulbs. It was offered to prove that during the week or ten days prior to Easter, 1930, all the hyacinths in a greenhouse owned by one party, not involved in this litigation, were lost because of the extreme weather. It is immaterial as to what occurred in the other greenhouses.

The findings, conclusions, and judgment of the trial court recognize that appellee is entitled to recover in this action all damages suffered—present, past, and future. Appellee recognizes this rule by its statement on page 99 of its brief, as follows:

"The judgment appealed from will be a bar to any future action by the plaintiff for damages

growing out of the operation of defendant's gas plant."

This court adheres to that rule.

Based upon all the facts and the law applicable thereto, the court is convinced that a fair trial was had and a correct result reached.

Judgment affirmed.