47 So.2d 227

### ROBERTSON v. STATE.

#### 6 Div. 763.

Court of Appeals of Alabama.
April 11, 1950.

Rehearing Denied April 25, 1950.

Davis & Bealle, of Tuscaloosa, for appellant.

A. A. Carmichael, Atty. Gen., and L. E. Barton, Asst. Atty. Gen., for the State.

1. Ante, p. 141.

BRICKEN, Presiding Judge.

The indictment charged appellant, defendant below, with the offense of murder in the second degree, in that, he unlawfully and with malice aforethought killed Robert Dobbins by shooting him with a gun, or pistol, but without premeditation or deliberation, etc.

Upon the trial in the lower court he was convicted of the offense of manslaughter in the second degree, and his punishment was fixed at one year hard labor for the county and a fine of $500. Proper judgment was duly pronounced and entered, from which this appeal was taken.

There was no denial by the defendant that he killed the deceased named in the indictment. He claimed however, that he killed him in self defense. There were no eye witnesses to the shooting. The undisputed testimony disclosed that the difficulty took place in the home of the appellant, at or about 3:00 A.M. June 27, 1948. The following "Statement of facts" contained in brief of the Attorney General appears to be substantially correct as appears in the record:

"On Sunday, June 27, 1948, appellant was residing at 2409 Jemison Avenue, in the so-called 'Elizabeth Quarters' of the City of Tuscaloosa, Alabama, he being employed as a janitor at the nearby University of Alabama. The house was a 'duplex' of the so-called 'shotgun' type, consisting of two 3-room apartments, separated by a thin partition, each apartment consisting of living room, bedroom, and kitchen directly in line. Appellant occupied the apartment on the east, and Riley and Julia Mae Ellis occupied the apartment on the west. In each apartment the middle room was normally used as the bedroom.

"Riley and Julia Mae Ellis testified that at about 3 A.M. o'clock, on the said date, they were in bed, he being awake and she being asleep. He overheard parts of a conversation between the appellant and Robert Dobbins, deceased. It appeared that appellant was near his front porch and was endeavoring to persuade Dobbins to come inside. Dobbins at first desisted, but appellant explained that he 'felt he had treated Dobbins wrong' and that appellant 'wanted to beg his pardon.' Dobbins entered the appellant's apartment and the conversation continued in the front room. The gist thereof was an accusation by Dobbins against the appellant. Dobbins expressing disbelief that the appellant was 'that type of man,' but asserting that Dobbins had 'seen it with his own eyes.' Dobbins conjectured at what the appellant's wife would say when she came home. The appellant gave no audible answer, and soon the conversation was terminated by a pistol shot fired, according to Ellis, in the appellant's front room. This shot awakened Ellis' wife. A second shot soon was heard in the appellant's middle room, and two more shots were heard in either the middle room or in the kitchen. There was an interval of from 5 to 15 seconds between the first shot and the last shot. Judging from sounds, it was the best judgment of Ellis and his wife that Dobbins was going towards the kitchen during the shooting. Dobbins was heard to plead: 'Please don't shoot me no more!' Appellant gave no answer, and kept firing.

"Having been shot four times, Dobbins upon five occasions called out to Ellis' wife: 'Julia, will you please come turn me over off my face?' Her husband would not allow her to respond to this call. In the meanwhile, the appellant was walking about his apartment mumbling to himself. Sometime after the shooting, he stepped to his back porch and called to a neighbor, Lola Lane, that he had 'shot a man' or had 'shot Robert Dobbins,' and requested her to telephone the police.

"Answering the call, two city police officers, Murry Morrison, and F. L. Boykin, arrived on the scene within 5 to 10 minutes. The appellant was standing on his front porch, and was dressed in pajamas. Dobbins was lying face down on the floor and in the doorway connecting the middle room and the kitchen. His head and about one-half of his body being inside the kitchen. Alive and conscious, he vainly pleaded with the officers to 'turn me over off my face.' The electric light in the appellant's middle room was burning, and

his pistol was lying on a trunk beside his bed. The officers arrested him, seized the pistol, and radioed for an ambulance. Neither the appellant nor Dobbins smelled of whiskey. Appellant was unharmed, but he stated that he had shot in self-defense when Dobbins advanced on him with an ice pick. Officer Morrison searched Dobbins and found two ice picks, one in his left hip pocket and the other beneath his body in or near his right hand. Dobbins admitted ownership of both, stating that he had brought them to the appellant's house. He further stated that the shooting was Dobbins' fault.

"Dobbins was removed by ambulance to the Druid City Hospital, where, shortly after admission, an examination by a physician, Dr. A. B. McKenzie, disclosed that Dobbins had been shot four times, one bullet cutting into and lodging in his spinal column. The physician informed Dobbins of his serious condition. He was conscious and, after stating that 'he did not think he was going to live,' asked for his mother. The physician saw him again at 8:00 A.M. o'clock and saw him a third time at 3:00 P.M. o'clock. Dobbins languished until between the hours of 3:00 P.M. and 4:00 P.M. o'clock, when he died. The cause of death was the bullet which punctured his spine.

"His brother, Mack Dobbins, visited the hospital at 6:00 A.M. o'clock. If the brother's testimony be believed, the fatally wounded man realized that he was *in extremis* and told the brother that he, Robert Dobbins was 'going to die.' Although paralyzed, he was conscious and appeared to be of sane mind. Three other friends and acquaintances, to wit, Frazier Johnson, A. J. Jackson, and Robert Drake, visited the hospital at about 12:00—12:30 P.M. o'clock. The deceased, from his death bed, gave to Johnson, Jackson and Drake the following explanation of the shooting, at about 2:00 P.M. o'clock:

"He stated that he had caught the appellant 'in action' with Dobbins' wife; that the appellant had called Dobbins into the appellant's house; that the appellant had a gun in his hand; that 'the appellant informed Dobbins that the appellant was going to kill him; that Dobbins told the appellant that he could 'have the woman,' Dobbins stating that he was 'through with her;' that Dobbins expressed surprise and in substance said to the appellant: 'You are going to kill me when I ain't looking for no trouble!'; that the appellant replied that he was going to get it all over with now!'; that the appellant then shot Dobbins and later threw an ice pick down by him."

"Dobbins further stated to Johnson, Jackson, and Drake as follows: 'And after trusting him, and this son of a bitch was in the wrong!', and affirmed the truthfulness of his story by stating, in the presence of his wife: 'Men, I wouldn't lay here and tell a story!', after he had accused his wife in the presence of his friends and she had cautioned him not to tell a falsehood.

"The purport of the appellant's testimony was to establish self-defense. In gist, he testified that he and Dobbins had been acquainted for six months; that the appellant was asleep when Dobbins came to his house and, by shaking on the front door, woke him; that Dobbins said that he wanted to talk to the appellant and 'beg his pardon'; that as the appellant gave him entrance Dobbins was holding his right hand behind him; that both went forthwith into the middle room; that Dobbins appeared like he was 'drinking'; that the appellant sat while Dobbins walked and talked; that Dobbins complained that his wife had left him and he instructed the appellant to 'have her back by 8:00 o'clock;' that the appellant then denied responsibility for the wife's leaving; that Dobbins suddenly attacked the appellant and started stabbing at him with an ice pick, whereupon the appellant reached to his dresser for his pistol and shot Dobbins once; that this first shot was fired while the appellant was sitting on a bed; that the appellant then attempted to escape by jumping over the foot of his bed and by running into the kitchen; that Dobbins pursued him and hence the appellant was forced to shoot him down in the kitchen doorway; that as Dobbins fell, he said: 'Call the Law—it's all my fault!', which

276

statement Dobbins later made to the police; that the police searched Dobbins and found him armed with two ice picks, one beneath him and one in his left hip pocket; and that the shooting occurred at about 3:30 A.M. o'clock and about twenty minutes after Dobbins came to the appellant's house. The appellant denied: (1) that Dobbins had said that he was 'through with the woman' and that 'you can have her'; (2) that the first shot was fired in the front room; (3) that the light of the middle room only was burning, the appellant testifying that the lights in both the front room and the middle room were burning; (4) and that he had called Dobbins into appellant's house. Thus, in material particulars the appellant's testimony conflicted sharply with that of Riley and Julia Mae Ellis, police officers, and the deceased. Moreover, he contradicted himself in stating that he kept his pistol on his *trunk*, whereas in firing the shot he testified he 'come up with the pistol off the *dresser.*' "

■ Pending the trial numerous objections were interposed and exceptions reserved to the rulings of the court upon the evidence. It appears however that the principal insistence of error is the ruling of the trial court in admitting in evidence the dying declarations of the deceased, the contention being that no sufficient predicate was shown.

It needs no extended discussion to hold that this insistence is without semblance of merit, for it affirmatively appears that the predicates testified to by several witnesses were sufficient and ample in every way to meet the required rule. This affirmatively appears from the stated facts hereinabove set out.

■ The objections and exceptions to the argument of the Solicitor are not well taken. There was ample evidence in the case to authorize the statements of the Solicitor; and one other objection to said argument presented a mere opinion of the Solicitor upon which error cannot be placed.

After a careful examination and consideration of the whole record we find no error of the court calculated to injuriously affect the substantial rights of the accused. To the contrary we regard the trial of this case throughout to have been conducted in every respect, very carefully and fairly.

No error appearing the judgment of conviction from which this appeal was taken will stand affirmed.

Affirmed.