202 So.2d 65

**Jack Farrell WHEAT**

**v.**

**STATE.**

**8 Div. 997.**

Court of Appeals of Alabama.

May 23, 1967.

Rehearing Denied June 20, 1967.

Beddow, Embry & Beddow, Birmingham, and Smith, Johnston & Walker, Huntsville, for appellant.

MacDonald Gallion, Atty. Gen., and John C. Tyson, III, Asst. Atty. Gen., for the State.

JOHNSON, Judge.

Appellant was indicted by the Grand Jury of Madison County, Alabama, on November 16, 1962, for the offense of murder in the first degree. Upon a plea of not guilty, a jury found appellant guilty of murder in the second degree and sentenced him to twenty years imprisonment in the State penitentiary as punishment therefor. Upon the denial of a motion for new trial and from this judgment, appellant makes this appeal.

The tendency of the evidence was as follows:

Edwin Franklin Womack, Jr., the State's first witness, testified that he was a student at Georgia Tech on a co-operative program, attending school for three months and working at Redstone Arsenal for three months, alternately. He stated that he first knew appellant when he worked in a laboratory with him at Redstone Arsenal in March, 1962, and that he worked with him again in October, 1962; that on October 20 he went to appellant's home at 9:00 or 9:30 A. M.; that neither of them were working on that day; and that he then took appellant to a downtown store and to Redstone Trailer Park where they stayed until about 1:30 P. M. putting up a television antenna and working on a washing machine. While they were there, appellant's wife came by and told them she was going to Clanton to visit her father and appellant stated that he was glad she was going. The witness stated that appellant had been drinking beer, both at his home and at the trailer park; that at 1:30 P.M. they left the trailer park and stopped at a store; and that he then took appellant home and left him.

Mr. Womack stated that he next saw the appellant at appellant's home at about 1:00 A. M. on the morning of October 21 where he had come to spend the night with appellant because he had said he didn't want to stay alone. Appellant opened the front door to let him in and appellant was clad in a tee shirt, a pair of slacks and a pair of socks. There was a woman there who was clad in a pajama top, panty girdle, stockings rolled below the knees and boots. She asked appellant who Womack was and was told that he was "a friend". Womack then had a drink with appellant and the woman.

Appellant and the woman discussed leaving the house but finally decided not to, during which time the woman and appellant continued to drink. The woman was using obscene language and the appellant was using "similar language, but to a lesser degree". The woman attempted to make a telephone call but found that the phone was dead. Womack attempted to make the woman dress so that they could take her home. Appellant went into his bedroom and locked the door and the woman was "rambling about" the house. Womack knocked on the door and, after several attempts, was admitted by appellant where he observed a gun and a box of shells on a chest of drawers. Womack said that he and appellant went back into the den and that he continued to try to get appellant and the woman to leave the house. Appellant then went into the "store room" for a few minutes, then the witness found him sitting on the steps sobbing and saying that he "didn't have any reason to live."

At one point appellant fell across the hood of the car, after which Womack got them both into the car. The witness said that he observed no difficulties between the two but that at one point the woman struck at him (the witness) with a high heeled shoe. They then left the house in appellant's car with Womack driving, the appellant sitting in the front seat with him and the woman seated in the center of the back seat. Womack stated that in his opinion they were both intoxicated and

that the woman asked to be taken to Meridian Street but when they reached this street, she told the witness that he should have turned to the left but it did not matter as she wanted to go to a "Crystal downtown". As they were driving toward town, the woman was using profane language and speaking in a very loud voice. They ran over a railroad track and she said, "Take it easy. Take it easy. Don't bounce me like that."

Appellant then turned around and Womack observed that he had a gun in his hand. The woman continued to talk loudly and profanely and the appellant pointed the gun toward the back of the car and said, "Shut up. I can't take it. I can't stand it anymore." Womack told the appellant to put the gun down and tried to calm both of them but the gun was fired. After this, the woman said nothing but slumped over in the back seat. The appellant held the gun for a few seconds and then laid it down on the seat and it was then picked up by Womack and put between the seat and the door of the car, on the driver's side.

The witness then asked the appellant what they were going to do now and appellant said to just drive and he drove as he was directed. The witness stated that in his best judgment the shooting occurred at about 2:30 A.M. and that he did not observe that the deceased or appellant hit at each other at the time of the shooting.

Womack stated that he and appellant drove to Ardmore, Tennessee, and turned down a dirt road where appellant directed him to stop the car and appellant then removed the woman from the car and placed her about six or eight feet from the side of the car. Appellant then reentered the car and instructed the witness to drive to Huntsville and, while en route, appellant threw some objects from the car. They then went directly to appellant's home and the witness left the appellant.

The witness testified that the next morning he recived a telephone call from appellant, in response to which he went to appellant's home and stayed about half an hour. The appellant asked him where the pistol was and Womack showed him that it was in the same position in appellant's car which it was the night before, between the front seat and the door on the driver's side of the car. Appellant then said that they had to "get rid of it" and instructed Womack to drive him south on Memorial Parkway. As they drove over Whitesburg Bridge appellant threw the pistol and the box of shells out of the car. They then returned to appellant's home and Womack stayed with him until about 2:00 P. M. and then went home for some sleep.

At 7:00 P. M. Womack was called by appellant's wife who asked him to come back to appellant's house. He did so and then decided to go to a neighbor's house in an effort to "get some more liquor to get him knocked out so we could manage him." Womack said that no liquor was available but that he obtained two sleeping pills which he gave appellant, after which they got him into the car and drove him to Birmingham. The witness and appellant's wife then returned to Huntsville.

Next, appellant introduced twenty witnesses who testified that his general character was good.

Dr. J. U. Speer, a qualified medical practitioner of Pulaski, Tennessee, testified that on October 21, 1962, he examined the deceased and found a wound caused by a firearm in the upper part of the left arm and the upper part of the left chest. He stated that he made an x-ray to determine the location of the bullet and found it to be located in her spine; he then opened the chest to try to locate and remove the bullet but before this was completed he was notified that the district attorney wanted him to perform a complete autopsy. He testified that he then made an incision the entire length of the chest and found that there was blood in the pleural cavity and he traced the line which the bullet took, indicating that it went downward and

backward to the spine. He stated that the left lung showed the track of the bullet through it and in his opinion her death was a result of the gunshot wound.

On cross-examination, Dr. Speer stated that he did not examine the clothing, only the body, and that the bullet entered the upper left arm and then came out of the arm and entered the chest. He said that there was a black discoloration which he interpreted to be powder burns; that the bullet entered between the ribs through the left lung and lodged in the spine about six inches from the point where it entered the body. He said that there were no other blows or wounds on the body.

Dr. William T. McVay, State Toxicologist, qualified as a firearms expert, testified that on October 23, 1962, he received a bullet from the Tennessee F. B. I. and on November 4, 1962, he received a pistol which was found that day by a skin diver. it was still in its holster and was found twenty feet down stream from the third pier of the Whitesburg Bridge. He made a ballistics test and determined that the bullet was fired through the pistol.

Appellant testified that he first saw Miss Honavich on Saturday night, October 20, 1962, at the American Legion Post in Huntsville which he visited at 10:30 or 10:45 P. M.; that there he had a beer and chatted with a friend, Bill Keller; and that at about 11:30 P. M. appellant ordered a drink and when the bartender announced that the bar would be closed in ten minutes, he purchased a pint of whiskey and paid for it with a $20.00 bill which he peeled from a roll containing $70.00 to $80.00. He stated that when the bartender returned with his change, Miss Honavich was seated at his left side at the bar and asked appellant to buy her a drink but the manager instructed the bartender not to serve her, and that she appeared to be intoxicated. Appellant testified that he then took his pint of whiskey and put it in his front left pocket and left the bar with a group who were also leaving; that he

walked to his car and as he opened the left-hand door, the woman opened the right-hand door and got in, informing him that he was taking her home. Appellant stated that when they arrived at Meridian Street, where she had told him she lived, she kept telling him to go further; that he turned the car around to go down Meridian Street again, telling the woman that he was married, his wife was out of town and that he did not want anyone gossiping about him being out with another woman; that she cursed him and said that she didn't have to get out of the car and that she would do as she pleased; that he threatened to take her to the police station for assistance; and that she patted her purse and said, "You big son of a bitch, there is something in here that says you won't take me to the police station." He said that he then told her that he would go to his residence and she could sleep in the car and that when they arrived there and he started toward the house she started "to scream and holler and curse * * * at a volume that could be heard a full city block at that hour of the morning." He stated that when he attempted to quieten her, she became louder and more obscene and, "in desperation", he took her in the house where she could not be heard.

Appellant testified that, once inside, Miss Honavich started going through all the rooms and through drawers, cursing pictures of appellant's wife and two children; that she then went into the kitchen and fixed two drinks and when he refused one, she started teasing him about not being able to hold his liquor; and that he then picked up the glass of whiskey and "downed it" in one swallow, after which he became lightheaded and his vision became blurred. He said that Miss Honavich informed him that she had made a telephone call to New York and that he then went outside and cut the telephone wires, after which she attempted to make another call to California.

After this, appellant stated that he remembered very little; that he did not re-

member leaving the house and getting into the automobile but while he was in the car his mind would come and go; that he was aware that Womack was driving and that the Honavich woman was sitting in the back seat; that he recalled that she was cursing him and that she grabbed him in the neck and shoulder with her fingers and fingernails and he remembered the occasion when the car passed over the railroad track. He stated that he recalled telling her that he could not stand any more of the noise and turning on his left knee to get her off his neck and shoulders; and that as he turned he felt the pistol on the front seat, picked it up and attempted to strike her with it as she attempted to strike him on the face and shoulder. He said that when he swung at her the pistol went off but stated that he did not intentionally pull the trigger. Appellant testified that the woman was then silent; that he was conscious of riding at times but was completely out at other times; that he did not recall removing the body from the automobile; nor did he remember what became of the pistol after he fired it; that it was morning before he regained consciousness and that he remembered calling Womack to come to his house. He said that the next thing he remembered was his stepfather, mother and wife trying to awaken him at his aunt's home in Birmingham.

William Franklin, a prisoner in the jail where appellant was taken on October 22, 1962, testified that the following morning he treated appellant's back for three or four fairly deep scratches. Having no alcohol, he had used shaving lotion. On cross-examination, the witness said that he could not remember whether appellant was brought in on a Sunday or Monday and that he did not see or know who placed the scratches on appellant's back.

Next, two witnesses for the State, Steve Marks and Bill Thompson, both testified that they knew appellant, that his reputation for truth and veracity was bad, and that they would not believe him under oath.

The following individuals submitted affidavits in behalf of appellant on his motion for a new trial:

Mr. Jeff D. Smith of Huntsville, an attorney associated with Mr. Roderick Beddow of Birmingham in the defense of appellant, averred in an affidavit that, after the verdict was read and before anyone else entered the jury room, Mr. Beddow entered the jury room in his presence; that he was present when Mr. Cary Walker, a member of Smith's firm, found a slip of paper in the jury room bearing the insignia of the King's Inn Motel; that this slip of paper contained twelve figures totaling 240; and that the total of these figures divided by 12 equaled 20, the number of years the appellant received as a sentence. Smith averred that since that time he has had this slip of paper in his possession and that its condition is unaltered and that it contained the following figures: 1–10, 5–20, 4–25 and 2–15. When Mr. Smith was called as a witness for the State, he stated that he saw other scraps of paper in the jury room which were collected by the jury and as he recalled they were turned over to the "office down there", that there was a five minute recess for Mr. Smith to try to locate the other pieces of paper, and that he did so and they were then marked as Exhibit 1. Some of them were torn and pasted together, some were in the waste basket and some were on the floor, according to Smith's testimony. On cross-examination Smith stated that he had examined all the bits of paper found in the jury room and that none of the figures were changed.

Mrs. Stella Farrell stated in an affidavit that shortly after the jury returned its verdict, she and a number of other individuals went into the jury room and went through the waste paper basket and discovered a piece of paper with King's Inn insignia on it and with the following figures written on it: 25–10, 15–25, 20–20, 20–25, 15–25 and 20–20. She said that to the side of this column of figures there appeared the

following figures: 1–10, 5–20, 4–25 and 2–15.

In affidavits, the following individuals stated that they too were present at the time the slip of paper was discovered and that the figures as set out above are correct: Mrs. Endes McCloskey, Mrs. Donna S. Steele, E. B. McCloskey, Mrs. Lallage F. McKee and E. B. McKee. Appellant's wife, Mrs. Ruby A. Wheat, stated that she was present in the jury room at the time the slip of paper was discovered.

In another affidavit Mr. Carey Walker stated that he was a practicing attorney in the City of Huntsville and that he was present during most of the trial and at the time the jury returned its verdict, at which time he was sitting in a chair immediately next to the jury room door, and that at no time did anyone leave or enter the jury room after the jury left it until the time Mr. Beddow entered it some five minutes later. He stated that after Mr. Beddow, Mr. Smith, himself and ten other people went into the jury room, the door was closed. He said that shortly thereafter, Mr. Beddow stated that it was his opinion that it was a quotient verdict and that they should search the room thoroughly. Mr. Walker stated that he began searching and found a small note crumpled in the waste basket, that this note contained the emblem of the King's Inn and that the figures thereon were the same as those named by Mrs. Farrell previously.

Mr. Roderick Beddow stated in an affidavit that he was a resident of Birmingham and that after the jury returned its verdict no one entered the jury room until he and twelve other individuals did. He said that he told these individuals that he believed that it was a quotient verdict and they should search the room thoroughly; that they found a piece of paper bearing the name and seal of the King's Inn Motel which was examined by Mr. Carey Walker and turned over to Mr. Smith for safe keeping. Mr. Beddow also stated that the figures totaled 240, which, divided by 12

was 20, the number of years given in the sentence. Beddow stated definitely that the verdict returned by the jury was a quotient verdict.

Appellant contends that the judgment in this case should be reversed because he was denied the safeguards guaranteed by the laws and Constitution of Alabama, in that each of the twelve men should agree independently as to their verdict and here the jury added up the figures and obtained a quotient. Appellant points out that when the writings on the papers found in the jury room were added and divided by twelve the quotient was twenty and that appellant's punishment was set at twenty years.

Appellant cites Sanders v. State, 243 Ala. 691, 11 So.2d 740, which in part says:

"It has been held that where there are shown figures used by the jury in its deliberations, fairly inferring that the verdict was a quotient, the court will so hold, and *unless the contrary is shown,* will also hold the verdict was the result of a previous agreement."

The State called four jurors as witnesses and they testified in pertinent part as follows:

Mr. Roy T. Gilbert, Foreman of the jury, testified that he had seen the slip of paper with the writings on it in the jury room and stated:

"I believe that these figures were written by Mr. Morman who was on the jury. But I couldn't say that this is not my handwriting. It looks similar to mine. I couldn't say. Sometimes I scribble and sometimes I write legible."

Mr. Gilbert further stated that "these figures here would be a tabulation of individual votes that were written down on individual pieces of paper and handed to either me or Mr. Morman"; that the figures were written down "to draw us closer together"; that the vote on the paper was not the final vote; and that there was no

previous agreement that they would use the figures to arrive at a quotient for determining the length of the sentence. On cross-examination, Mr. Gilbert stated that the figures were either the last vote or the next to last vote; that he divided the total of 240 by 12 mentally and not on paper; that, in his best judgment, as each tabulation was made the number of years decreased; and that a vote was taken after this tabulation and the jury fixed appellant's punishment at twenty years. On re-direct examination, Mr. Gilbert stated that he did not recall any of the other tabulations being added up.

The next juror to testify was Mr. Robert Morman who stated that, in his best judgment, the handwriting of the twelve figures was his but the total under the line and the writing to the left of the figures were not his; that "everybody wrote down a figure on a piece of paper" which was passed out to them; that there were "either three or four" such ballots taken to the best of his memory; that "it was never mentioned" that the jury would set down the figure of each individual juror and they would be added up and divided by 12 and that this would be the verdict; and that there was some discussion about how the jurors were voting because they were trying "to get together at a mutual number of years". On cross-examination, Mr. Morman stated that he acted as a clerk and that both he and the foreman gathered in the slips of paper and did the figuring; that he remembered one average distinctly which came to 23 or 24 years"; that he was cognizant of the fact that the 240 total would come to 20 years; but that he was not sure whether this was the last vote or not and that all the tabulations were done by the foreman. He also stated that no announcement was made as to the number of years which the quotient came to.

The next juror called as a witness was Mr. Billy Ray Bentley and he stated that he had never seen the slip of paper, labelled Exhibit A, before; that in the deliberations of the jury there was no agreement between the members of the jury to set down the figure of each individual member and then divide the total by twelve and use that figure for the verdict; and that there was more than one ballot taken by the jury.

On cross-examination, Mr. Bentley stated that several ballots were taken and that the foreman collected them but that he did not state what the total was and that "there was no 10 years" on the last ballot and that the slip of paper marked Exhibit A "would have to be at least the third." He also stated that the last ballot was verbal and that twenty years was the lowest figure arrived at.

Alvin Gipson, also a juror in the case at bar, testified that if Exhibit A was in the jury room, he probably did see it. He stated that "there was some discussion of taking each man's, take a piece of paper and write down the number of years that he considered adequate and turning them in so that we might average them up and get something to work from. But as far as making an agreement to abide by that, we did not." On cross-examination, Mr. Gipson stated that when they saw how far apart they were someone "made the suggestion that we each turn in what we thought was an adequate amount to get some kind of an average to see how far apart we were." He testified that to the best of his judgment the figures in question were turned in an hour before they reached a verdict and that the last hour was spent in argument.

█ We feel that the testimony of the jurors reveals that such figures merely represented earlier deliberations by the jurors and did not constitute an agreement or prior agreement and that the weight of the evidence shows that the figures were merely a "working basis". At the hearing on the motion for new trial four jurors were examined and their testimony reveals that the figures introduced by the appellant on the motion were not used by the jury in their final vote. The testimony does not

establish appellant's contention that the jury reached a quotient verdict. In Harris v. State, 241 Ala. 240, 2 So.2d 431, the court said:

"The rule of the cases is that it is misconduct on the part of the jurors, justifying a reversal, for them to agree, after they have found accused guilty, that each shall set down on paper the term of imprisonment or the amount of fine which, in his opinion, should be assessed, that these sums shall be added and the total divided by twelve, and the quotient thus reached accepted as the verdict of the jury. 'There is no error, however, if there was no positive prior agreement to abide by the result of this process, but it is afterward discussed and either adopted or a modification thereof agreed upon. And even though there may have been an agreement, if the jury subsequently refuse to abide by it, and impose a greater or a less punishment than the quotient, there is no error.' 16 Corpus Juris, p. 1087, Sec. 2552, 23 C.J.S. Criminal Law § 1374."

In support of his contention that the verdict was a quotient, appellant quotes from Sanders v. State, supra. We observe that in *Sanders* the court also states the following:

"The rule is, however, that in order to render a verdict objectionable and subject to vacation on the ground that it was a quotient verdict, it devolves upon the assailant of the verdict to show by competent evidence that the jury adopted this plan in arriving at a verdict, and that they agreed in advance to be bound by the result of such proceeding. The vitiating fact is the agreement in advance to abide by the result. Birmingham R., Light & Power Co. v. Moore, 148 Ala. 115, 42 So. 1024; Bank of Tallassee v. Elmore Fertilizer Co., 16 Ala. App. 465, 78 So. 648; Henderson Land & Lumber Co. v. Brown, 16 Ala. App. 453, 78 So. 716."

See also Copeland v. State, 252 Ala. 399, 31 So.2d 390; State ex rel. Senter v. Cowell, 125 Mo.App. 348, 102 S.W.2d 573.

The case of Bank of Tallassee v. Elmore Fertilizer Co., supra, states the rule as follows:

"* * * To render a verdict objectionable and subject to vacation on the grounds that it was a quotient verdict, it devolves upon the assailant of the verdict to show by competent evidence that the jurors in advance agreed to be bound by a particular mode adopted of arriving at the verdict."

The jurors testified that the figures used were a "worksheet" only. This is permissible in Alabama by the case of Uptain v. State, 37 Ala.App. 290, 71 So.2d 111, cert. den. 260 Ala. 459, 71 So.2d 115, which states in part as follows:

"The authorities hold that, if there is no agreement among the jurors in advance of the voting that the average estimate shall be binding, and the balloting is done merely for the purpose of forming a working basis as was done in the case at bar, the verdict is not vitiated. Harris v. State, 241 Ala. 240, 2 So.2d 431; Sanders v. State, 243 Ala. 691, 11 So.2d 740; City of Dothan v. Hardy, 237 Ala. 603, 188 So. 264, 122 A.L.R. 637; McBride v. Baggett Transp. Co., 250 Ala. 488, 35 So.2d 101; Fortson v. Hester, 252 Ala. 143, 39 So.2d 649; Copeland v. State, 252 Ala. 399, 41 So.2d 390."

See also McMichen v. State, 34 Ala.App. 300, 39 So.2d 47, and Harris v. State, supra.

■ The appellant further contends that he was denied his right to present his full legal defense by the denial of the trial court of the right to prove the deceased woman's pattern of immoral conduct over the years. He claimed that he was drugged by Miss Honavich and that as a result thereof he did not have any knowledge of what he was doing at the time the woman was killed and, therefore, he could

not have the intent necessary for a murder conviction. He contends that the court denied him the right to prove that this woman who met her death was notorious throughout the South as a prostitute and as one who doped men whom she picked up for the purpose of stealing money from.

In the case at bar the evidence revealed clearly that the deceased was invited to the home of the appellant, by appellant himself, accompanied by Womack, and further, the shooting did not take place until much later in the evening while the parties were riding in an automobile, presumably to take the deceased home.

It is the opinion of this court that the sustaining of the objection by the trial court to the introduction of proof of deceased's traits of character, habits or course of conduct in other cities and on other occasions was too remote in point of time or place to be relevant in the case at bar.

The applicable law is stated in 22A C. J.S. Criminal Law § 682, pages 738–739 as follows:

"* * * it is not competent to prove one crime by proving another, and that one accused of crime is to be convicted, if at all, by proof of the commission of that crime alone, even though he has put his character in issue. Proof that accused committed other crimes, even if they were of like nature to that charged, is not admissible to show his depravity or criminal propensities, or the resultant likelihood of his committing the offense charged * * *."

See also Little v. State, 24 Ala.App. 484, 136 So. 864; Govan v. State, 40 Ala.App. 482, 115 So.2d 667; Murray v. State, 43 Ala.App. 5, 178 So.2d 233.

The record shows that the appellant was permitted to testify, and did testify, that on the night in question Mrs. Honavich poured a glass of whiskey for appellant, that he "downed it" in one swallow, and that he then became light headed and his vision became blurred. It then became a jury question as to what this "glass of whiskey" really contained.

We presume that appellant presented all of the evidence available to him relating to the possibility of appellant's being drugged by the deceased on the night in question. There is no rule of evidence applicable to this case which would have permitted appellant the right to strengthen this contention by showing what the pattern of conduct of the deceased might have been in the commission of alleged similar acts at other times and places.

We have carefully examined this record pursuant to the duty enjoined upon us in Tit. 15, Sec. 389, Code of Alabama, 1940, we have also carefully studied the briefs filed in this case, and we find no reversible error committed by the court below.

This cause is due to be and the same is hereby

Affirmed.

PRICE, P. J., and CATES, J., concur in judgment of affirmance only.