HARRIS, Judge.
Appellant was convicted of murder in the first degree and the jury fixed his punishment at life imprisonment in the penitentiary. At arraignment, in the presence of his counsel, appellant pleaded not guilty and not guilty by reason of insanity. After sentence was imposed, appellant gave notice of appeal. He was found to be indigent and was furnished a free transcript and trial counsel was appointed to represent him on appeal.
When the State rested appellant moved the Court to exclude the State’s evidence on the grounds that the evidence was insufficient, as a matter law, to take the case to the jury on the charge laid in the indictment or on any lesser included offenses. This motion was overruled.
On the night of February 24, 1976, the deceased met his death in the Krystal Restaurant on the Atlanta Highway in the City and County of Montgomery, Alabama, as a result of knife wounds inflicted upon his body by appellant. There were many eyewitnesses to this killing and their versions of the killing were, in the main, similar.
For a better understanding of the background of the parties involved and the events that led up to and culminated in the death of the deceased we think it well to first set forth appellant’s contentions that provoked his actions on the night of February 26, 1976.
The wife of appellant testified that about three weeks prior to the night that the deceased was stabbed to death by her husband she was employed as a counter girl at Ron’s Krispy Fried Chicken place on South Decatur Street. She had irregular hours of employment and during her breaks the deceased, Cecil Perdue, would come in and sit in the same booth with her without being invited to do so. She said that Perdue would follow her around the restaurant and he tried to get her to go out with him. She further testified that Perdue made improper advances to her and suggested that she make love with him and her husband would never know about it. She rejected all of the proposals made to her by the deceased and was greatly annoyed and upset by his persistence to the point that she talked to her employer about the conduct of the deceased. Her employer advised her to tell her husband what the deceased was trying to persuade her to do with him.
Mrs. Thomas further stated that on another occasion the deceased came to her apartment and attempted to place his hands behind her head and kiss her. She resisted these attempts and finally got him to leave her apartment. She said on the day that Perdue was killed he walked into her apartment without knocking or ringing the doorbell. Her landlady was present on this occasion and Mrs. Thomas talked to Perdue and got him to leave the apartment.
She further related that her husband picked her up from work on February 26, 1976, and she told him about Perdue’s seductive attempts and that he would not leave her alone. According to her testimony her husband became very upset when she told him about Perdue’s conduct toward her. She stated that she asked her husband to get the deceased to stop bothering her.
Appellant testified that he picked his wife up at her place of employment on the night of the homicide around nine-thirty and, while on their way to pick up their baby at the home of a babysitter in the Cloverland area, his wife told him about Perdue’s actions and conduct toward her. He turned around and went back to Ron’s place on Decatur Street and asked the manager if he knew where Perdue lived and the manager told him he did not know Perdue’s address. Appellant then drove to the babysitter and got their child and from there he *27 went to his mother’s store on Ann Street near the intersection of Highland Avenue. From there he drove to the Trackside Service Station on the Southern Bypass. After getting gasoline he drove on the Eastern Bypass to the Atlanta Highway and turned and went to the Krystal Restaurant where his wife told him the deceased might be. He stated that he drove several miles, and about an hour in time, looking for Perdue after his wife first told him about Perdue’s actions and conduct toward her.
Appellant parked at the Krystal and left his wife and child in the car. He started to enter the restaurant and saw a man sitting in a booth. He returned to the car and asked his wife if that man was Perdue and she told him yes. After obtaining confirmation from his wife as to the identity and presence of Perdue, he walked into the restaurant and requested Perdue to go outside with him as he did not want to start anything on the inside. Perdue did not accept his invitation to leave the restaurant and appellant slapped him. Appellant stated that after he slapped Perdue the deceased threw a cup of coffee in his face. After this occurred appellant could not remember any of the facts or circumstances surrounding the fight or the stabbing of the deceased. He stated the next thing he recalled was an officer pointing a gun at him, placing him under arrest and carrying him to Police Headquarters.
At 11:15 p. m. on the night of the homicide appellant was given the Miranda rights and warnings and he said he understood his rights. He made and signed a statement in which he admitted that after his wife told him about Perdue’s conduct he went riding around from place to place looking for him, saying, “I just wanted to beat him up and let him know I did not want him hanging around my wife anymore.” He further stated, “I did not intend on cutting him. All I wanted to do was to whip on him and make him leave my wife alone.” In the signed statement appellant said he did not know he had cut and stabbed the deceased until a policeman stopped him outside the restaurant and took the knife out of his pocket.
Dr. Richard A. Roper, Assistant State Toxicologist, testified to his education, qualifications and experience. He stated that he performed an autopsy on the body of the deceased and found eight clean cut wounds varying from one-half inch to four inches in length and that these wounds were slashing-type wounds. He said three of the wounds were penetrating wounds and that one penetrated into the base of the neck and cut the carotid artery which was a major artery supplying blood to the head and brain. He testified that another wound penetrated the chest cavity and entered the left side of the heart. The third penetrating wound entered the abdominal cavity and wounded the liver. Dr. Roper concluded his testimony by saying:
“Based on the results of my examination I concluded that death resulted from acute internal hemorrhage, in other words, massive internal bleeding associated with multiple stab wounds to the body.”
Mr. Louis N. Surles, an employee of the State Health Department, testified that, at approximately 10:30 o’clock on the night of February 26, 1976, he was in the Krystal Restaurant on the Atlanta Highway; that when he entered he saw a man seated in a booth reading a book. He gave his order, got a number, and sat in a booth waiting for his number to be called. He then observed another man standing at the booth where the man was reading a book. He identified the man who was standing as the defendant. He heard an argument and looked around and heard the defendant tell the other man, “I’ll kill you, _______ _, I’ll kill you,” and he saw the defendant slap the man who was seated. He learned that the man who was slapped was Mr. Perdue. He then saw Mr. Perdue get out of the booth and start swinging and kicking at the defendant. He noticed the defendant pushing the deceased toward one end of the restaurant and then he heard the deceased say, “He stabbed me, he stabbed me.” He immediately saw blood on the *28 shirt of the deceased. At this point Mr. Surles saw the defendant drop his hand and appear to be closing a knife with blood on his hand. The defendant turned around and started out the door and Mr. Surles followed him out the door to see if he could get a tag number. At this time a detective grabbed the defendant and stopped him from leaving.
Mrs. Emily Bodine testified that she was in the Krystal Restaurant on the night of the homicide and she saw the deceased sitting in a booth reading a book. A short time later she saw the defendant standing immediately adjacent to this same booth. She heard someone say, “Go on outside,” and a fight ensued between the deceased and the defendant. At the conclusion of the fight she noticed a knife-like object which the defendant put in his pocket and he started walking out the restaurant. She further stated that she did not see coffee thrown by either the deceased or the defendant.
Jeffery Wayne Potts was at this restaurant with Emily Bodine. He first saw the defendant in the men’s rest room and observed him put his hand in his pocket and walk out the door. When Potts left the rest room he noticed the defendant and Mr. Perdue arguing and then they began to fight. After the fight was over he saw the defendant leave the restaurant with a knife in his hand.
Irene Brown Moulton testified that she was employed at the restaurant where the homicide occurred. She stated that the defendant came in the restaurant and did not stop at the counter but went straight to where Mr. Perdue was sitting and started fighting Perdue. When the fight was over she saw the defendant putting a knife-like object in his pocket and heard Perdue calling for help. She said that Mr. Perdue came behind the counter and blood was gushing out of him.
John Jeffcoat testified that he was employed as a security guard at the Salvation Army building on Bell Street. He said that he and a friend were witnesses to the killing and he noticed the defendant go straight to Mr. Perdue. He did not hear any words spoken when the defendant reached the booth where Mr. Perdue was sitting but the defendant started beating bn Mr. Perdue and stated, “I’ll kill you,_ _, I’ll kill you.” He said the defendant struck Mr. Perdue three times and Mr. Perdue stood up. The defendant kept hitting the deceased and kept stating, “I’ll kill you,_, I’ll kill you.” He heard someone holler, “blood”, and he saw blood all over the floor. When the deceased was being wheeled out on a stretcher he observed a big hole on Mr. Perdue’s chest. He further stated that he did not see any coffee stains on the defendant’s shirt. ■
Eugene Hanes was in the Air Force at the time of Cecil Perdue’s death and was an eyewitness to the killing. He testified that the defendant came into the restaurant and walked across the entire seating area to Mr. Perdue’s booth; that Mr. Perdue stood up and sat down again at which time the defendant slapped Perdue. Perdue stood up again and he and the defendant started fighting. He said the defendant kept hitting Perdue in the chest and backed him up against a window directly behind him; that Mr. Perdue was trying to defend himself by kicking the defendant. After Perdue stopped kicking he grabbed his chest and Mr. Hanes observed a tremendous amount of blood on the shirt of the deceased. When the fight ended Mr. Hanes saw the defendant put a brown object in his pocket and walk out of the restaurant at which time he was arrested by a police officer.
There was other testimony relating to the fight and stabbing of the deceased by appellant. No one claimed that the deceased was armed with any type of weapon and all witnesses testified that appellant was the aggressor.
Appellant adduced some testimony by police officers that they observed stains on appellant’s shirt that could have been coffee stains. The shirt worn by appellant was taken from him when he was committed to jail but it could not be located.
*29 Appellant introduced evidence as to his good character and his reputation for being a peaceful man in the community.
Photographs of the body of the deceased were introduced into evidence over appellant’s objection that they were calculated to prejudice and inflame the jury. Several photographs of the murder scene were offered into evidence. Some of these were objected to by appellant and some were introduced into evidence without objection. The knife used by appellant to kill the deceased was introduced into evidence without objection.
Although appellant interposed a special plea of not guilty by reason of insanity there is not a thread of testimony even tending to show that he was insane at the time he stabbed Cecil Perdue to death.
Photographs of the deceased and the locus in quo are admissible in murder prosecutions when they shed light upon the character and location of the wounds on the victim’s body and when the proper predicate has been laid. Snow v. State, 50 Ala. App. 381, 279 So.2d 552; Boulden v. State, 278 Ala. 437, 179 So.2d 20; Smarr v. State, 260 Ala. 30, 68 So.2d 6.
Gruesomeness is not ground for excluding evidence consisting of photographs if it has a reasonable tendency to prove or disprove some material fact in issue, and if it illuminates the issues in any way, and is relevant, it is admissible even though possessing a tendency to inflame the minds of the jury. McKee v. State, 33 Ala.App. 171, 31 So.2d 656; Hurst v. State, 54 Ala.App. 254, 307 So.2d 62.
Appellant contends that the oral charge of the court was erroneous in many respects. We do not agree.
The trial court gave a very comprehensive charge on murder in the first degree, murder in the second degree, and manslaughter in the first degree. He charged the jury fully on the law of self-defense even though under the evidence in this case appellant was the aggressor and was not free from fault in bringing on the difficulty. The Court also charged the jury on the law dealing with a killing done in the heat of passion. Under the facts as developed in this case we think the oral charge was most favorable to appellant.
The evidence discloses that, after appellant was told by his wife that the deceased had, made improper advances to her, he drove for miles looking for the deceased and the time lag was more than an hour before he found the deceased. That he was mad and sought to avenge his feelings can be fairly inferred from his own statements and actions.
It is settled law in Alabama that exceptions to the Court’s oral charge must be made in the presence of the jury and before they retire to deliberate on their verdict. Owens v. State, 53 Ala.App. 553, 302 So.2d 240; Evans v. State, Ala.Crim. App., 338 So.2d 1033. The record clearly shows that appellant did not comply with the law in the foregoing cases.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.