Winfred Taft Storie was indicted for the first degree murder of one James Otis Cotton by shooting him with a pistol. At trial he was found guilty of murder in the second degree, and punishment was fixed by the jury at thirty-seven years in the state penitentiary. His subsequent motion for a new trial being overruled by the trial court, Storie brings this appeal informa pauperis.
The first witness for the State was John Kilbourne, an employee of the State Department *Page 1180 
of Forensic Sciences stationed in Florence, who testified that, on October 24, 1978, he had had occasion to perform an autopsy on the body of a seventy-four year old white male identified to be James Otis Cotton. Mr. Kilbourne stated that his examination revealed the presence of trauma consistent with a gunshot wound to the left side of the decedent's face, and further testified that he had ascertained the entry wound to be just to the left of decedent's left nostril, and the exit wound to be at the base of the neck at a downward angle from the entry wound. Mr. Kilbourne concluded from his examination that Mr. Cotton had bled to death as the result of a single gunshot wound, which had caused the severing of the left carotid artery.
The witness testified on cross-examination by the defense that he had been unable to locate traces of gunpowder around the wound as would be consistent with a close range gunshot, and estimated that the shot would have had to have been made within a range of four feet to deposit such a residue. He further stated that he had not located a slug in Mr. Cotton's body, and that death had ensued very rapidly after the injury to the carotid artery.
Brent Allen Wheeler, a criminalist with the same department in Huntsville, stated that he had received training and experience in ballistics analysis. He identified several items of ammunition and a pistol as having been received by him from investigator Harry Perry of the Morgan County Sheriff's Department on October 24, 1978; appellant stipulated that the pistol was his. Mr. Wheeler further testified that among the items were an expended cartridge and a slug, and he compared these items to ammunition test-fired through appellant's pistol, concluding that appellant's pistol had fired the slug retrieved by Investigator Perry on the night in question.
Wayne Henry Hughes, a Decatur resident, testified that, on the night of October 23, 1978, he had gone to a "party" being held in a house owned by one Lindsey around 8:30 or 9:00 o'clock, and that there were a number of people present eating barbeque, drinking and "shooting dice." Mr. Hughes stated that he remained almost the entire night in the kitchen area, where beer and whisky were being kept and dispensed, and that James Otis Cotton was present as well, seated in a chair at a table. According to the witness, appellant arrived some time later and at some point ended up in the kitchen with Mr. Hughes and James Cotton. Appellant and Cotton began "arguing about who could out draw who and who could shoot who and . . . what gun was the best gun to have . . .," although, according to Mr. Hughes, "they might be angry a second and then just talking" (R. 59). At one point during this exchange, appellant produced a .45 caliber pistol from a shoulder holster, emptied the ammunition out of the gun and placed one of the bullets between his teeth. He then reloaded the pistol, returned it to its holster, and challenged Cotton that, "If you think you can outdraw me, just go ahead" (R. 60). Mr. Hughes stated that he never saw Cotton pull a weapon, nor did he think that Cotton was armed at the time. The witness further testified that he then left the room and had only been gone for a few minutes when he heard a sound "like a firecracker going off." Upon returning to the kitchen, he found Cotton still seated in the chair with his head on the table and appellant seated, but holding his pistol pointed at the ceiling. Mr. Hughes stated that appellant said, "`Wayne, I shot him. I didn't mean to but I shot him,'" and "`The old man made me do it . . . I didn't mean to do it . . . I shot him'" (R. 63-64). Mr. Hughes then told appellant to place the pistol on the table, which appellant did, and the Sheriff's Department was summoned.
Mr. Hughes acknowledged on cross-examination that Mr. Cotton had been a good friend of his, and that appellant had worked for his father, but that he did not think appellant and Cotton had previously known each other. He further stated that they had all been drinking, and that both appellant and Cotton were "pretty well intoxicated," but he had not seen them fight that night before the shooting. Mr. Hughes also testified that appellant "more or less *Page 1181 
seemed like he was numb" (R. 68), or in a "state of shock" over the shooting, but that he remained at the house to await the arrival of the sheriff.
Investigator Harry Perry of the Morgan County Sheriff's Department testified that, in the early morning hours of October 24, 1978, he had been directed to proceed to the scene of a shooting, and that on arrival he found a victim lying underneath a table in the kitchen. Other persons present were Kenneth Lindsey, the owner of the house, Dewey Hughes, Wayne Hughes and appellant, and there was a pistol lying on the table. Investigator Perry stated that he subsequently turned this pistol over to Brent Wheeler for examination, and in the course of his investigation located a spent cartridge on the kitchen floor and a slug in an adjoining bathroom, both of which he also gave to Wheeler. According to the witness, the slug pierced a wall separating the kitchen and bathroom, and then struck a "pipe chase" in the bathroom. Investigator Perry stated that he conveyed the appellant to the jail, where he was formally arrested and searched, the search disclosing a holster.
On cross-examination, Investigator Perry testified that, though he had not seen any evidence of dice shooting at the scene of the shooting, he had noticed the presence of liquor bottles and the odor of alcohol about the appellant. While he was sure that appellant had been drinking, Investigator Perry stated that, when he conversed with him at the jail, he did not have any problems with slurred speech or the like.
At this point, the State rested, and the defense then rested without calling any witnesses. The appellant did not take the stand.
 I
The appellant first contends, as he did unsuccessfully on his motion for new trial, that the trial court erred in failing to instruct the jury that a killing must be intentional to support a conviction for either second degree murder or first degree manslaughter. It does not appear that counsel for appellant requested that such a charge be given, and it is evident that when the court had completed its oral charge and inquired of the parties, "Is there anything else by either party now," counsel for appellant replied, "No, sir, Judge" (R. 106, 107).
 "Exceptions to the oral instruction of the court must be taken in the presence of the jury and before the jury retires so that the trial judge will have an opportunity to make any corrections. Thomas v. State, Ala.Cr.App., 352 So.2d 25; Owens v. State, 53 Ala. App. 553, 302 So.2d 240, cert. denied, 293 Ala. 769, 302 So.2d 243 (1974); Cox v. State, 280 Ala. 318, 193 So.2d 759 (1967)."
Maund v. State, Ala.Cr.App., 361 So.2d 1144 (1978). We find that as no objections or exceptions to the oral charge of the court were made, there is nothing for this court to review as to this issue.
 II
During the closing argument of the prosecutor, the following occurred:
 "MR. SLATE: I believe I will object to the statement by counsel that, `The law as you see is slanted to protect the defendant.'
 "THE COURT: Ladies and gentlemen, that is a matter of opinion among attorneys. The law must be considered the rule that we abide by regardless whether it favors one or the other, but since it is an opinion only and is not binding on you, I will overrule the objection.
"MR. SLATE: We except." (R. 95)
Appellant contends that this statement and the action of the trial court constituted reversible error. We initially note that, while counsel for appellant did take the precaution to quote, at least essentially, the objectionable statement as required by our cases, Briggs v. State, Ala.Cr.App.,375 So.2d 530 (1979); and Earley v. State, Ala.Cr.App., 358 So.2d 494,cert. denied, Ala., 358 So.2d 501 (1978), we are unable to ascertain from the reported statement exactly in what context this objectionable statement was made, or what "law" the prosecutor was referring to as "slanted." Taking *Page 1182 
this statement standing alone, we agree with the trial court that labeling the "law" to be "slanted" was merely a statement of opinion by the prosecutor.
 "While the bare quotation may not give us a true picture of the exact status of the argument, it would seem to us that the statements of the solicitor were merely arguendo of his opinion of the case and what the result of the jury's verdict should be."
Sanders v. State, 260 Ala. 323, 70 So.2d 802 (1954). See Owensv. State, 291 Ala. 107, 278 So.2d 693 (1973); Kendrick v.State, 55 Ala. App. 683, 318 So.2d 378 (1975); Robertson v.State, 35 Ala. App. 273, 47 So.2d 227, cert. denied, 254 Ala. 92, 47 So.2d 230 (1950). Further, the trial judge, while he did overrule appellant's objection to the statement, instructed the jury that it was to apply the law regardless of whether it might or might not be "slanted" one way or the other. Such was, we feel, quite sufficient to negate any sort of real or imagined prejudicial effect that this statement might have had on the jury. Cf., Slinker v. State, Ala.Cr.App., 342 So.2d 44
(1977).
 III
As one of the grounds of his motion for a new trial, which motion was denied by the trial court, the appellant asserted that the sentence of thirty-seven years imprisonment meted out by the jury was an impermissible "quotient" verdict, and in support thereof, counsel for appellant introduced various scraps of paper which, he stated under oath, he had removed from the jury room "trash basket" immediately after the return of the verdict and the sentencing of appellant. Several of these scraps display various numbers written upon them, and one piece clearly shows a series of twelve numbers divided into two vertical columns and totaled to equal the number 440. On this same piece of paper, the number 440 is divided by the number 12 to reveal a figure of 36 2/3, which is crossed out and the number 37 substituted. Appellant argued on his motion for new trial, and does so now as well, that this clearly indicates that a quotient method of reaching a verdict was employed by the jury in setting the somewhat odd sentence of thirty-seven years. On the other hand, the prosecution in rebuttal offered twelve affidavits, in reality forms bearing identical language, with one being signed by each of the jurors before a notary public; the forms all state:
"STATE OF ALABAMA MORGAN COUNTY
 "This day personally appeared before me, the undersigned authority in and for said State and County, [name of juror] who being by me first duly sworn according to law, deposes and says that the matters and things set forth in the following affidavit are true and correct.
 "My name is __________, and I am a resident of Morgan County, Alabama. I was a member of the jury in the murder trial of Winfred Taft Storie on April 30, 1980, in the Circuit Court of Morgan County, Alabama.
 "I have been shown a photocopy of several pieces of paper reflecting various figures and calculations including one piece of paper showing twelve numbers averaged together and the number 37. These numbers were used by myself and the other jurors in our deliberations to form a working basis for our discussion.
 "We, as a jury, did not agree to be bound by the average figure prior to its calculation.
 "I, as a member of the jury, retained my independence until a verdict was reached and returned in open court.
 "We, as a jury, affirmed 37 years as our verdict, after the calculations were completed, both in the jury room and in open court when we were polled.
 "I, as a juror, affirmed 37 years as my verdict after the calculations were completed, both in the jury room and in open court when I was polled.
 "I did not, and would not, vote to return a verdict that was not in accordance with my independent judgment and conscience.
 "/s/
Affiant *Page 1183 
 "Sworn to and subscribed to before me this the ___ day of May, 1980.
___________________ Notary Public"
(R.149-160)
We find that none of the jurors were personally called before the court and examined on this matter.
It is, of course, well settled by a number of criminal and civil decisions in this State that a "quotient" verdict has no place in our system of jurisprudence.
 "A true verdict is the voluntary conclusion of the jury after deliberate consideration, and it is none the less a true verdict because the respective jurors may have been liberal in concessions to each other, if conscientiously and freely made. A verdict is not a true verdict, the result of any arbitrary rule, or order, whether imposed by themselves or by the court or officer in charge. If a jury should agree in advance, and this agreement may be determined by their actions as well as words, that their verdict should be the result or quotient of a division by 12 of the sum total of all the jurors' separate assessments, a verdict brought about by such an agreement ought to be set aside."
Ledbetter v. State, 17 Ala. App. 417, 85 So. 581 (1920). See,State v. Steele, Ala., 374 So.2d 325 (1979); Lazarte v. City ofMountain Brook, 287 Ala. 96, 248 So.2d 153 (1971); Copeland v.State, 252 Ala. 399, 41 So.2d 390 (1949); Harris v. State,241 Ala. 240, 2 So.2d 431 (1941); New Morgan County Building LoanAssociation v. Plemmons, 210 Ala. 286, 98 So. 12 (1923);International Agr. Corporation v. Abercrombie, 184 Ala. 244,63 So. 549 (1913); Southern Railway Company v. Williams, 113 Ala. 620,21 So. 328 (1897); Collins v. State, Ala.Cr.App.,365 So.2d 113, cert. denied, Ala., 365 So.2d 116 (1978); Mann v.State, 26 Ala. App. 558, 163 So. 821 (1935); Stone v. State,24 Ala. App. 400, 135 So. 646 (1931). The essence of the above-stated rule, however, is that there must have been aprior agreement by the members of the jury that they would bind themselves to the result of the calculations; as thus stated inSanders v. State, 243 Ala. 691, 11 So.2d 740 (1943):
 "The rule is, however, that in order to render a verdict objectionable and subject to vacation on the ground that it was a quotient verdict, it devolves upon the assailant of the verdict to show by competent evidence that the jury adopted this plan in arriving at a verdict, and that they agreed in advance to be bound by the result of such proceeding. The vitiating fact is the agreement in advance to abide by the result. Birmingham R., Light Power Co. v. Moore, 148 Ala. 115, 42 So. 1024; Bank of Tallassee v. Elmore Fertilizer Co., 16 Ala. App. 465, 78 So. 648; Henderson Land Lumber Co. v. Brown, 16 Ala. App. 453, 78 So. 716."
(Emphasis supplied)
To this end, if there is no such prior agreement then the jury is free to use such averaging methods to arrive at a "working basis" or "medium" provided the individual jurors are than able to accept or reject the result of the calculations. See Harrisv. State, supra, and cases therein cited; Collins v. State, supra; Wheat v. State, 44 Ala. App. 45, 202 So.2d 65, cert.denied, 281 Ala. 287, 202 So.2d 73 (1967); Uptain v. State,37 Ala. App. 290, 71 So.2d 111, cert. denied, 260 Ala. 459,71 So.2d 115 (1953); McMichen v. State, 34 Ala. App. 300,39 So.2d 47 (1949).
We are here presented with, on the one hand, scraps of paper which would clearly demonstrate that some averaging was employed by the jury for whatever reason, and on the other had twelve affidavits signed by the jurors denying that there was any prior agreement to be bound by the results of the calculation. In Mobile O.R. Co. v. Watson, 221 Ala. 585,130 So. 199 (1930), the burden of proof in such instances was discussed:
 "The rule has long prevailed in Alabama that, when there are shown figures used by a jury in its deliberations from which a fair inference may be drawn that the verdict was a quotient, the court will so hold, and that it was the result of a previous agreement unless the contrary is shown." (Emphasis supplied) *Page 1184 
Thus, certainly a court may consider jurors' affidavits which tend to deny allegations of misconduct and support their original verdict although, by the same token, such evidence is incompetent when submitted for the purpose of impeaching the jury's verdict. Maring-Crawford Motor Company v. Smith,285 Ala. 477, 233 So.2d 484 (1970); Austin v. Tennessee BiscuitCompany, 255 Ala. 573, 52 So.2d 190 (1951); Harris v. State, supra; Pratt v. State, 50 Ala. 275, 278 So.2d 724, cert.denied, 291 Ala. 796, 278 So.2d 729, cert. denied,414 U.S. 1002, 94 S.Ct. 357, 38 L.Ed.2d 238 (1973); Lazarte v. City ofMountain Brook, 46 Ala. App. 653, 248 So.2d 148, affirmed,287 Ala. 96, 248 So.2d 153 (1970).
We conclude that the trial court correctly overruled appellant's motion for new trial in this regard, in that we are not persuaded that the jurors agreed to be bound by the result of any calculations as appellant asserts. The jurors each signed affidavits, which affidavits denied any misconduct in regard to a quotient verdict, and we see no significance in the fact that the affidavits were identical in language and that the notary public was "the secretary for the District Attorney of Morgan County" (Appellant's brief at 18). Additionally, we note in the trial record (111-114) that the trial court examined each juror at the return of the verdict on whether each had individually agreed on the terms of the verdict, and all stated that they had done so. Appellant urges that SouthernRailway Company v. Williams and Ledbetter v. State both cited supra, compel a different result, but we find those decisions to be factually inapposite. In the Williams case, it only appears that the sole rebuttal against a memorandum displaying obvious calculations indicating a quotient verdict was that the jury did not make the memorandum, while in Ledbetter the court said that "[a] full consideration of all of the testimony shows that by their acts the jury did agree in advance to a quotient verdict, and that this agreement was carried out." Here, by contrast, the twelve jurors denied through sworn affidavit that they had an impermissible prior agreement, and instead said that the figures used were for a "working basis for our discussion," certainly not impermissible under the above-cited authorities.
Our examination of the record has not revealed any error mandating reversal. The judgment rendered below is therefore
AFFIRMED.
All the Judges concur.